[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY13, 2002
THOMAS K. KAHN
CLERK

No. 99-8007

D. C. Docket No. 92-00147-CV-6

JAMES W. SIKES,
FELIX KEMP, Individually and On
Behalf of All Other Persons Similarly Situated,

Plaintiffs-Appellees,

versus

TELELINE, INC, USA NETWORKS,

Defendants,

AMERICAN TELEPHONE & TELEGRAPH COMPANY,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Georgia

**(February 13, 2002)**

Before TJOFLAT, WILSON and FLETCHER*, Circuit Judges.

_____

*Honorable Betty B. Fletcher, U.S. Circuit Judge for the Ninth Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

American Telephone & Telegraph Corporation ("AT&T") appeals the district court's certification, pursuant to Fed. R. Civ. P. 23(b)(3), of a class of plaintiffs who present claims arising from a "900-number" telemarketing program. We conclude that the district court abused its discretion in holding that the questions of law or fact common to the members of the proposed class predominate over any questions affecting only individual members and that, therefore, the class would be manageable.[1] We therefore reverse the certification of the class and remand for further proceedings.

## I.

### A.

In <u>Andrews v. American Telephone & Telegraph Co.</u>, 95 F.3d 1014 (11th Cir. 1996), we held that the district court erred in certifying two classes under Rule 23(b)(3)[2] of the Federal Rules of Civil Procedure because the plaintiffs had failed

---

[1] Our decertification of the class based upon predominance negates the need to address whether providing notice of this action by means of publication rather than by individual notice was proper. See <u>Andrews v. Am. Tel. & Tel. Co.</u>, 95 F.3d 1014, 1021 (11th Cir. 1996).

[2] Federal Rule of Civil Procedure 23(a) and (b) provide:
(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

to demonstrate that common issues predominated.[3]  The first class of plaintiffs, the

"Andrews class," brought suit against various telecommunications carriers and

_____

(b) Class Actions Maintainable.  An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
        (1) the prosecution of separate actions by or against individual members of the class would create a risk of
                (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
                (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
        (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
        (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

[3] Andrews involved two related appeals that the court "treat[ed] . . . in the same opinion because the appellants raise[d] similar issues and appeal[ed] the same class certification order." Andrews, 95 F.3d at 1018.  The first class was the "Andrews class" and the second class was the "Harper class."

services providers, alleging that several 900-number telephone programs,[4] which

the defendants were providing to the public, were

> gambling activity [that] is illegal under the laws of all of the fifty
> states, and constitutes racketeering activity in violation of the federal
> RICO statute, 18 U.S.C. §§ 1961 to 1968 (1994), the Communications
> Act of 1934, 47 U.S.C. §§ 201 to 229 (1994), and the federal common
> law of communications law.
>     [The] complaint further allege[d] that the defendants committed
> mail and wire fraud, in violation of 18 U.S.C. §§ 1341 & 1343 (1994),
> in furtherance of a RICO enterprise . . . .  In addition to the allegations
> concerning a national gambling enterprise, [the plaintiffs] allege[d]
> that the defendants . . . violated Georgia statutes that prohibit the
> operation of a gambling business within that state.

Id. at 1019 (internal citations and quotations omitted).

The district court certified a master class and a Georgia subclass, the master

class consisting of

> [a]ll persons who paid for one or more 900-number telephone calls
> billed and collected by [two of the defendants], which calls were made

---

[4] The court explained:
Pay-per-call, or "900-number," telephone service was developed in the early
1980s.  It was first used for telephone polling and other interactive programs
designed to disseminate a wide variety of information to customers, who were
usually billed for the calls in their monthly phone bills.  After its inception, the
900-number industry rapidly expanded to encompass varied news, sports,
weather, and entertainment information programs, as well as promotional and
giveaway contests.  While the specifics of different 900-number programs vary
greatly, their basic operation is the same: callers are enticed by television
commercials, direct mail solicitation, or other advertising materials to call a 900
number, for which the callers are charged either a flat fee per call or a per-minute
rate.
Id. at 1018-19.

4

in connection with programs offering sweepstakes, games of chance, awards, cash or other prizes, gifts, or information on unclaimed funds.

Id. at 1020-21.  Finding that the court had abused its discretion in certifying the master class,[5] we held that while

> [i]t may be true that, at a general level, the predominant issue presented in Andrews is whether the [defendants] were involved in the operation of illegal gambling schemes that used 900 numbers to facilitate caller participation . . ., as a practical matter, the resolution of this overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.

Id. at 1023.  Drawing on Pelletier v. Zweifel, 921 F.2d 1465, 1499-1500 (11th Cir. 1991), for the proposition that "each plaintiff must demonstrate reliance on deceptive conduct in furtherance of [an] alleged RICO scheme," we stated that "[t]he class's mail and wire fraud allegations . . . are not wholly subject to class-wide resolution."  Id. at 1023-24.  As to the claims based upon state gambling laws, we held that "the need to interpret and apply the gaming laws of all fifty states to assess the legality of each 900-number program [is] foremost among the difficulties in trying the gambling claims on a class basis."  Id. at 1024.

The second class of plaintiffs, the "Harper class," brought suit against various telecommunications carriers and services providers that offered several

---

[5] We did not disturb the district court's determinations regarding standing under Fed. R. Civ. P. 23(a).  Id. at 1022-23.

900-number programs to the public. The plaintiffs alleged that the defendants had committed mail and wire fraud, thereby violating federal RICO and Georgia RICO, "by approving and mailing misleading promotional and solicitation materials [for 900 numbers regarding credit cards] and by collecting the revenues produced by caller participation." Id. at 1021. The court certified a master class and a Georgia subclass, to include

> persons who paid for one or more 900-number telephone calls billed and collected by [two of the defendants], which calls were made in connection with programs offering credit cards, financial information services, catalog cards, or information on obtaining credit cards or catalog cards.

Id.

We were "even more certain that the Harper class is unsustainable under Rule 23(b)(3)" than we were about the Andrews class, because "individual issues abound and are magnified by the necessity of applying diverse state laws to programs that in many cases have little in common beyond their use of 900 numbers." Id. at 1024. After noting the significant problem that "the [multiple] 900-number programs at issue . . . differ widely" in many respects, we held that the class was unsustainable because of the individualized nature of the plaintiffs' claims:

> Even if it could be shown that the appellants were engaged in a scheme to defraud and made misrepresentations to further that

6

scheme, the plaintiffs would still have to show, <u>on an individual basis</u>, that they relied on the misrepresentations, suffered injury as a result, and incurred a demonstrable amount of damages. As [with the Andrews class], the problems with trying the individualized elements of the plaintiffs' claims, as well as handling the unique aspects of the 900-number programs, are compounded by the necessity of referencing fifty sets of credit card and consumer protection laws.

<u>Id.</u> at 1025 (emphasis added) (internal citations omitted).

B.

The case at bar presents facts that are almost identical to those involved in the <u>Andrews</u> case, with one variation. Instead of multiple 900-number programs being challenged, in this case there is only one: the "Let's Make a Deal" program ("LMAD"). The district court described LMAD as follows:

> This automated interactive telephone game was modeled on the television game show of the same name. The game had up to six levels, and at each level the caller could win a prize by selecting the correct "door" behind which the prize was concealed. Upon winning a prize, the caller could either accept that prize or advance to the next level. If the caller chose to advance, any previously awarded prize was forfeited in exchange for a chance at a larger prize. Plaintiffs claim that the odds of ultimately winning the maximum $2,000.00 cash prize were 1 in 2,700.

<u>Sikes v. Am. Tel. & Tel. Co.</u>, No. CV-692-147 (S.D. Ga. Mar. 26, 1998) at 2-3.[6]

---

[6] A transcript of a recorded call to the program, appended to the plaintiffs' complaint, reveals the following presentation:
Man's Voice: "Hi, I'm Monty Hall. Welcome to the all new Let's Make a Deal Telephone Game."

7

Woman's Voice: "Now you have a chance to win $2,000.00[. T]o go right into the game press one now. Let's Make a Deal is brought to you by Teleline, Inc., at a cost of $3.88 per minute and an average length per call is six minutes. If you do not want to play hang up now."

Music.

Monty Hall: "Now you have a chance to win great cash prizes at every level, all the way up to $2,000.00. That's right, friend, if you reach the top level of the game you can win $2,000.00 instantly right on this call. And if you win the $2,000.00 grand prize, you can receive your prize on the next business banking day. That's right. You could be $2,000.00 richer on the next business banking day. So let's get ready to play."

Music.

Monty Hall: "Press one if you are calling from a touchtone phone."

Caller presses one.

. . . .

Monty Hall: "On TV, I used to ask contestants if they had an unusual object. Of course, I can't do that now so instead I'm going to ask you a question. Ready?"

Applause.

Monty Hall: "The Kennedy Space Center is named for which [P]resident? Press one for Franklin Roosevelt, press two for John F. Kennedy, press three for James Monroe."

Caller enters number.

Music.

Monty Hall: "You're right."

Applause.

Monty Hall: "Now there are three doors up on the stage with me. Behind one of those doors is a valuable prize. Which door do you choose? Press one, two or three."

Caller presses number.

Monty Hall: "Let's see, yes, that's the right door and here's Jane to tell you what you have chosen."

Jane: "It's a bag full of shiny nickels worth $15.00 in cash. (Applause.) The prize will be paid to you the player in the form of a check made out to you the player. Congratulations from Let's Make a Deal."

Monty Hall: "Now it's time to make your decision. You can take your prize and leave the game now or you can keep playing and try for a more valuable prize on the next level, level 2."

Jane: "Monty, the prize on the next level is $25.00 cash. Behind one of the doors on level 2 is $25.00 cash."

Monty Hall: "But remember, one of the doors will have a bigger prize but two of the doors will not. Do you want to risk what you have won? Press one if you want to keep your prize and quit now. Press two if you want to keep playing."

Plaintiffs, individuals who had called LMAD and incurred charges (in excess of any winnings they may have received), brought suit, individually and on behalf of all others similarly situated, in the United States District Court for the Southern District of Georgia.[7] The plaintiffs sued: (1) Teleline, Inc. ("Teleline"), the creator and operator of LMAD; (2) the U.S.A. Network, which broadcast a portion of the television advertising for LMAD; and (3) AT&T, which acted as Teleline's telecommunications carrier and billing contractor.

---

Caller presses number.
Applause.
Monty Hall: "Great. I'm glad you want to keep playing. Now we are on the second level. Behind one of the three doors is a valuable prize."
Jane: "And Monty, that prize is $25.00 in cash."
Monty Hall: "Which door do you choose? Press one, two or three."
Caller presses number.
. . . .
Weird noise.
Monty Hall: "Oh, dear, you chose the wrong door. Here's Jane to tell you what you could have won."
Jane: "You could have won [an amount of money]."
("Ahhhhhhhhhh."[)]
Jane: "But instead, you chose the wrong door. You gave it a good try and we hope you enjoyed playing Let's Make a Deal."
Music.

[7] The named plaintiffs are James W. Sikes and Felix Kemp. These two individuals are the named plaintiffs for both the master class and the Georgia subclass described infra.

Count One of the plaintiffs' complaint[8] asserted that the defendants had violated the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("federal RICO").[9] Section 1962(c) criminalizes participation "in the conduct of an enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."[10] Section 1962(d) criminalizes conspiracy to do the same.[11] Section 1964(c) permits a civil plaintiff to sue for recovery of costs, attorneys' fees, and treble damages sustained as a result of a defendant's violation of section 1962.[12]

---

[8] We refer throughout to the plaintiffs' amended complaint, filed May 7, 1993, simply as "the complaint." Plaintiffs' original complaint was filed on November 11, 1992.

[9] We note that the plaintiffs' complaint is yet another example of what we have often criticized as "shotgun pleadings," where each count "incorporates" all of the preceding paragraphs and counts. We have harshly criticized such shotgun pleadings in the past, and we repeat our displeasure with this type of complaint now. See, e.g., Magluta v. Samples, ___ F.3d ___, No. 00-12540 (11th Cir. 2001); Cramer v. Florida, 117 F.3d 1258, 1263 (11th Cir. 1997); Ebrahimi v. City of Huntsville Bd. of Educ., 114 F.3d 162 (11th Cir. 1997); Cesnik v. Edgewood Baptist Church, 88 F.3d 902, 905 and n.9 (11th Cir. 1996); Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll., 77 F.3d 364, 366-67 (11th Cir. 1996); Pelletier v. Zweifel, 921 F.2d 1465, 1517-18 (11th Cir. 1991).

[10] 18 U.S.C. § 1962(c) provides:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

[11] 18 U.S.C. § 1962(d) provides:
It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

[12] 18 U.S.C. § 1964(c) provides:
Any person injured in his business or property by reason of a violation of section

Count One alleged that the defendants had violated sections 1962(b),[13] (c), and (d) by engaging in a pattern of racketeering activity that included "numerous acts of connected, related and continuing mail and wire fraud with the advertisement and solicitation of calls to [LMAD's 900 numbers], the answering of each individual 900 number call to these number[s], and the billing and collection of charges for each such 900 number call." Such activity was allegedly in violation of the wire and mail fraud statutes, 18 U.S.C. §§ 1341 and 1343,[14] which satisfy the definition of "racketeering activity" as set forth in section 1961(1)(B).[15] Further, Count One asserted that the defendants engaged in an illegal gambling

---

1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final.

[13] Section 1962(b) provides:
It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

[14] See infra note 25.

[15] 18 U.S.C. § 1961(1)(B) defines racketeering activity, in pertinent part, as: "any act which is indictable under any of the following provisions of title 18, United States Code . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)."

business, in violation of 18 U.S.C. § 1955,[16] by operating LMAD. The plaintiffs alleged that this illegal gambling business constituted racketeering activity under section 1961(1)(B) and the continued operation of LMAD established a pattern of racketeering activity. Finally, Count One asserted that each charge incurred by a caller to LMAD's 900 numbers constituted a gambling debt, which is an unlawful debt within the meaning of section 1961(6). The defendants' billing and collection of this unlawful debt thus constituted unlawful debt collection. Since Count One asserted that the defendants had violated sections 1962(c) and (d) by engaging in and conspiring to engage in a pattern of racketeering activity (wire and mail fraud and illegal gambling) and collection of unlawful debt, the plaintiffs prayed for relief according to section 1964(c).[17]

Count Two of the complaint alleged that the plaintiffs were the beneficiaries of a contract between AT&T and Teleline, and that AT&T's failure to enforce the terms of the contract caused direct injury to the plaintiffs. Count Three alleged that AT&T violated provisions of the Federal Communications Act of 1934, as amended, 47 U.S.C. §§ 151 et. seq. Specifically, Count Three asserted that

---

[16] See infra note 42.

[17] The substantive discussion infra Part III focuses only on the propriety of class certification with respect to the federal RICO claims, for that is what the parties have briefed before this court. Our analysis applies equally, however, to the appropriateness of class certification with respect to the other counts of the complaint.

AT&T's participation in LMAD was unjust and reasonable in violation of 47

U.S.C. § 201,[18] and that AT&T's crediting or refunding of LMAD charges to some

but not all customers was a discriminatory practice in violation of 47 U.S.C. §

202.[19]  The plaintiffs thus prayed for relief under 47 U.S.C. § 206.[20]  Count Four

was brought under the Georgia Racketeer Influenced and Corrupt Organizations

---

[18] 47 U.S.C. § 201 provides, in pertinent part:
(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the order of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.
(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulations that is unjust or unreasonable is declared to be unlawful.

[19] 47 U.S.C. § 202 provides, in pertinent part:
(a) It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

[20] 47 U.S.C. § 206 provides:
In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee shall be taxed and collected as part of the costs in the case.

Act, O.C.G.A. § 16-14-1 et seq. ("Georgia RICO"), on behalf of those plaintiffs who had lost money because of their participation in LMAD while in the State of Georgia (the "Georgia plaintiffs"). The Georgia plaintiffs alleged that the defendants' LMAD activities constituted the predicate acts of theft by taking and theft by collection, and that these acts constituted a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4. Count Five alleged that the ongoing conduct of LMAD constituted "a nuisance and a nuisance per se threatening harm to the general public." The plaintiffs thus sought "declaratory relief," as well as preliminary and permanent injunctions, and asked that "all sums presently held by any of the Defendants which have been collected in connection with the playing of [LMAD] be deposited with the registry" of the court.

In sum, the plaintiffs prayed for actual damages, treble damages, punitive damages, declaratory relief, an order enjoining the defendants from continuing to advertise or operate LMAD, and costs and attorneys' fees.[21]

The district court certified a master class on Counts One through Three under Fed. R. Civ. P. 23(b)(3), consisting of

> [a]ll natural persons who have been billed for telephone calls originating from their households made to the 900-number "Let's

---

[21] The prayer for injunctive relief became moot when the defendants ceased operating LMAD voluntarily.

14

Make a Deal" game and have not received cash prizes exceeding such charges.

The court also certified a Georgia subclass on the Georgia RICO claim (Count Four), consisting of

[a]ll members of the class who have been charged for calls made from the State of Georgia to 900-860-4332 and/or other 900 prefix telephone numbers used to play "Let's Make a Deal."

After this court handed down its opinion in <u>Andrews</u>, AT&T moved the district court to decertify the master class on the federal RICO claim.[22] The district court denied the motion and AT&T appeals.

II.

A.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(b), which provides for appeals from an order that involves "a controlling question of law as to which there is substantial ground for difference of opinion" if the immediate appeal from such order "may materially advance the ultimate termination of the litigation."[23] The district court certified its order denying class

---

[22] AT&T is the only defendant left in the case. As the district court stated in its order denying AT&T's motion to decertify the class, "Plaintiffs have . . . voluntarily dismissed their claims against Teleline, and they entered into a settlement agreement with USA Networks. Thus, AT&T is the sole remaining Defendant in this action."

[23] 28 U.S.C. § 1292(b) reads:
When a district judge, in making in a civil action an order not otherwise appealable under

15

certification for interlocutory appeal, in accordance with the statute.  We granted

permission to appeal.

B.

We review the propriety of the district court's certification of a class for an

abuse of discretion.  Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1233

(11th Cir. 2000).  "A district court abuses its direction if . . . it applies the wrong

legal standard, Delta Air Lines, Inc. v. ALPA, Int'l, 238 F.3d 1300, 1308 (11th Cir.

2001), or makes findings of fact that are clearly erroneous, In re Celotex Corp., 227

F.3d 1336, 1338 (11th Cir. 2000)."  United States v. Sigma Int'l, Inc., 244 F.3d

841, 851-52 (11th Cir. 2001).  If "the district court properly exercised its discretion

within the parameters of Rule 23, the court's determination should stand."

Andrews v. Am. Tel. & Tel. Co., 95 F.3d 1014, 1022 (11th Cir. 1996).  If the

court's certification was "erroneous as a matter of law," however, the court

necessarily abused its discretion and the class should be decertified.  Jackson v.

---

this section, shall be of the opinion that such order involves a controlling question of law
as to which there is a substantial ground for difference of opinion and that an immediate
appeal from the order may materially advance the ultimate termination of the litigation,
he shall so state in writing in such order.  The Court of Appeals which would have
jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal
to be taken from such order, if application is made to it within ten days after the entry of
the order: Provided, however, That application for an appeal hereunder shall not stay
proceedings in the district court unless the district judge or the Court of Appeals or a
judge thereof shall so order.

16

Motel 6 Multipurpose, Inc., 130 F.3d 999, 1006 (11th Cir. 1997) (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S. Ct. 2447, 2461, 110 L. Ed. 2d 359 (1990)).

III.

"A class action may be maintained only when it satisfies all the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b)." Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1005 (11th Cir. 1997). The district court certified the plaintiff class in this case pursuant to Rule 23(b)(3), which provides that a class may be maintained if "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and if a class action is a "superior" method of adjudicating the controversy. We have made clear that Rule 23(b)(3) "imposes two additional requirements" for class certification – predominance and increased efficiency. Jackson, 130 F.3d at 1006. The plaintiffs had the burden of meeting the requirements of Rule 23(a) and Rule 23(b)(3).[24] See Rutstein v. Avis Rent-A-Car Sys., Inc., 211 F.3d 1228, 1233 (11th Cir. 2000).

A.

---

[24] AT&T does not assert that certification was improper according to Rule 23(a).

17

AT&T contests the district court's certification of the plaintiff class with respect to the federal RICO claims predicated on the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343. AT&T asserts that the "predominance" requirement of Rule 23(b)(3) is not satisfied and that the class is not manageable. The plaintiffs counter that the manageability issue "is one of practicality and not one of law." They assert that "[i]t cannot be error [for the district court] to hold that a case can be managed if the case, in fact, can be managed." And, they point out, the district court claimed in its certification order that "common issues predominate, that individual issues can be adequately managed, and that class treatment is a superior method of adjudication."

While we do not dispute that manageability is generally an issue of fact and practicality and not one of law, we cannot overlook the fact that the district court reached its conclusions on manageability based upon a faulty legal premise.

A violation of the mail or wire fraud statutes, 18 U.S.C. §§ 1341 and 1343,[25] requires proof that a person "(1) intentionally participate[d] in a scheme to defraud another of money or property and (2) use[d] the mails or wires in furtherance of that scheme."  Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991).  When a

---

[25] The substantive elements of mail fraud and wire fraud are identical.  Beck v. Prupis, 162 F.3d 1090, 1095 (11th Cir. 1998).  "The only difference between the two offenses is their jurisdictional basis – mail fraud requires proof of the use of the mails, while wire fraud requires proof of the use of the wires."  Id. at 1095 n.9.

> The mail fraud statute reads:
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1341.

> The wire fraud statute reads:
> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.  If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.

19

civil RICO claim is predicated upon mail or wire fraud, the plaintiff must additionally show that "he was injured by reason of the defendant's acts of deception." Id. at 1499; see also 18 U.S.C. § 1964(c) (providing civil remedies only to those persons who are injured "by reason of" racketeering activity). Thus, when a plaintiff brings a civil RICO case predicated upon mail or wire fraud, he must prove that he was "a target of the scheme to defraud" and that he "relied to his detriment on misrepresentations made in furtherance of that scheme." Pelletier, 921 F.2d at 1499-1500; see also Andrews v. Am. Tel. & Tel. Co., 95 F.3d 1014, 1025 (11th Cir. 1996).

We can therefore summarize the elements of a civil RICO claim predicated upon mail or wire fraud as follows: The plaintiff has the burden of proving: (1) that the defendant intentionally participated, (2) in a scheme to defraud,[26] (3) the plaintiff of money or property, (4) by means of material misrepresentations,[27] (5) using the mails or wires, (6) and that the plaintiff relied on a misrepresentation made in furtherance of the fraudulent scheme, (7) that such misrepresentation

---

[26] "A 'scheme to defraud' involves the making of misrepresentations intended and reasonably calculated to deceive persons of ordinary prudence and comprehension." Beck, 162 F.3d at 1095.

[27] The Supreme Court recently clarified that materiality is an element of the offense of mail or wire fraud. Neder v. United States, 527 U.S. 1, 25, 119 S. Ct. 1827, 1841, 144 L. Ed. 2d 35 (1999) ("[W]e hold that the materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

would have been relied upon by a reasonable person,[28] (8) that the plaintiff suffered injury as a result of such reliance,[29] and (9) that the plaintiff incurred a specifiable amount of damages.

1.

In its certification order, the district court properly recognized that "reliance is a necessary element of a civil RICO claim based on mail or wire fraud." The court disagreed "with AT&T's contentions regarding the necessity of conducting individual inquiries on this element." Instead, the court determined that "reliance may be virtually presumed" in this case.[30] This was error.

We were faced with an identical presumption in Andrews, 95 F.3d 1014, wherein the district court employed a "presumption" of reliance using language very similar to that in the instant case. In Andrews, we made clear that, even assuming that the plaintiffs could prove a scheme to defraud and

---

[28] "[T]he plaintiff must prove that a reasonable person would have relied on the misrepresentations." Beck, 162 F.3d at 1095.

[29] In causing the plaintiff to suffer injury, the plaintiff must prove that the racketeering activity caused the injury. Beck, 162 F.3d at 1095-96 ("[T]he racketeering activity must be more than simply the 'but for' cause of the injury; it must also be the proximate cause.").

[30] In its order on AT&T's motion to decertify the class in light of Andrews, the court stated: "I previously concluded that the individual issues of reliance, injury, and damages do not preclude class certification in this case, and the panel majority's opinion in Andrews does not alter that conclusion." The court reiterated that "reliance could be virtually presumed under the facts of this case, as any caller who played the game and who was charged more than he or she won in prizes was necessarily injured 'by reason of' the game."

21

misrepresentations in furtherance of that scheme, "the plaintiffs would still have to show, on an individual basis, that they relied on the misrepresentations." Id. at 1025 (emphasis added).

The district court attempted to distinguish Andrews on the basis that the classes in that case "involved numerous different 900 number programs, whereas [the instant] case involves only the LMAD game." Andrews does not permit such a distinction.

In discussing the Andrews class, we stated that the "overarching common issue" was overshadowed by "an unmanageable variety of individual . . . issues." Andrews, 95 F.3d at 1023. In support of this conclusion, we said that the "mail and wire fraud allegations, for example, are not wholly subject to class-wide resolution." Id. at 1023-24. With respect to the Andrews class, our rejection of the district court's use of a presumption regarding reliance and damages[31] was our only comment pertaining to the mail and wire fraud allegations. (The other reasons we listed for decertifying the Andrews class related only to the gambling claim.)

---

[31] For the reliance presumption, Andrews cited Pelletier, 921 F.2d at 1499-1500, for the proposition that "each plaintiff must demonstrate reliance on deceptive conduct in furtherance of the alleged RICO scheme." Andrews, 95 F.3d at 1024. With respect to damages, Andrews cited Alabama v. Blue Bird Body Co., 573 F.2d 309, 328-29 (5th Cir. 1978), for the proposition that a court should have "'serious reservations about the manageability of a class' when all damage questions cannot be handled by one forum." Andrews 95 F.3d at 1024; see also infra Part III.A.2.b.

22

With respect to the Harper class, <u>Andrews</u> noted first that the 900-number programs at issue differed widely, such that "each program must be assessed individually to determine whether fraudulent tactics were employed by the appellants." <u>Id.</u> at 1025. This statement shows that the diversity of the 900-number programs was probably sufficient grounds, on its own, for decertification. The next paragraph of the opinion, though, contained an alternate holding. Therein, we assumed that the plaintiffs could overcome the hurdle of individually assessing each program to determine whether the appellants used fraudulent tactics but noted that the plaintiffs would nonetheless have to show on an individual basis that they relied, suffered injury, and incurred damages. <u>Id.</u>

Thus, with respect to <u>both</u> classes in <u>Andrews</u>, we rejected the propriety of allowing a presumption that would relieve plaintiffs of their burden of having to prove every element of a claim. Because we rejected a presumption of reliance in <u>Andrews</u>, we must do the same in this case.

The function of presumptions supports the conclusion of <u>Andrews</u>. A presumption is generally employed to benefit a party who does not have control of the evidence on an issue. A presumption places a burden of production on the party against whom it is directed; this party must present evidence sufficient "to rebut or meet the presumption, but [the presumption] does not shift to such party

23

the burden of proof."  Fed. R. Evid. 301.  In the case at hand, AT&T has no

evidence regarding whether the plaintiffs "relied" upon misrepresentations.  The

plaintiffs themselves are in control of this information.  It would be unjust to

employ a presumption to relieve a party of its burden of production when that party

has all the evidence regarding that element of the claim.

The plaintiffs urge us to follow cases in which they say reliance was

"presumed."[32]  The cases upon which plaintiffs rely, however, address "fraud-on-

---

[32] Other than the cases cited in the text and notes infra, the plaintiffs cite Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir. 1985); Peterson v. H & R Block Tax Servs., Inc., 174 F.R.D. 78 (N.D. Ill. 1997); Smith v. MCI Telecommunications Corp., 124 F.R.D. 665 (D. Kan. 1989); Davis v. S. Bell Tel. & Tel. Co., 1993-2 Trade Cas. (CCH) ¶ 70,480 (S.D. Fla. 1993); Bryan v. Amrep Corp., 429 F.Supp. 313 (S.D.N.Y. 1977); Cope v. Metro. Life Ins. Co., 696 N.E.2d 1001 (Ohio 1998); Amato v. General Motors Corp., 463 N.E.2d 625 (Ohio Ct. App. 1982); Weinberg v. Hertz Corp., 499 N.Y.S.2d 693 (N.Y. App. Div. 1986); Occidental Land, Inc. v. Superior Court of Orange County, 134 Cal. Rptr. 388 (Cal. 1976); Vasquez v. Superior Court of San Joaquin County, 94 Cal. Rptr. 796 (Cal. 1971).

The plaintiffs also cite a host of cases for the proposition that "[r]eliance upon a fraud may be proved by circumstantial evidence."  We do not say herein that reliance must be proved by direct (as opposed to circumstantial) evidence.  We merely hold that reliance may not be presumed such that a plaintiff does not have to come forward and prove an element of the claim.

the-market" claims.[33]  See 17 C.F.R. § 240.10b-5 ("Rule 10b-5").[34]  This is an

important distinction, for, as the Supreme Court has stated:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . .  Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the statements.

Basic, Inc. v. Levinson, 485 U.S. 224, 241-42, 108 S. Ct. 978, 989, 99 L. Ed. 2d

194 (1988) (quoting Peil v. Speiser, 806 F.2d 1154, 1160-61 (3d Cir. 1986)).[35]  The

Court's reason for employing a presumption of reliance in Basic rested upon the

very nature of the market itself and the price as set by the market.

_____

[33] To the extent that the plaintiffs cite us to cases that do not address a securities market context, we find these cases unpersuasive.

[34] Rule 10b-5 reads:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5.

[35] The Court, in employing the presumption, emphasized that the defendant could rebut the presumption by making "[a]ny showing that sever[ed] the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Basic, 485 U.S. at 248, 108 S. Ct. at 992.

> An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.

Id. at 247, 108 S. Ct. at 992.

Our circuit has adopted the theory that the unique nature of the public securities market distinguishes fraud on the market from other claims of garden-variety fraud. Our case law refers to this unique nature of the public securities market as the "integrity of the market." Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 722 (11th Cir. 1987); Shores v. Sklar, 647 F.2d 462, 469 (5th Cir. May 1981) (en banc) (holding that reliance may be established by proof that securities not traded on the open market could not have been issued at all but for a fraudulent scheme of the defendants; the plaintiff still had to prove that he "relied on the integrity of the offerings of the securities market"). While Kirkpatrick stated that the fraud-on-the-market theory did not preclude class treatment when the purchasers of a security "might have relied on factors other than the integrity of the market," 827 F.2d at 723, it clarified that the fact that the plaintiffs "may have obtained the allegedly misleading information via their individual brokers" did not preclude class treatment, id. at 724. In other words, Kirkpatrick simply held that, in the fraud-on-the-market context, class treatment was not precluded just because

some plaintiffs may have relied upon a person who owed the plaintiff a fiduciary duty rather than relying upon the integrity of the market itself.[36]

The securities market presents a wholly different context than a consumer fraud case, and neither this circuit nor the Supreme Court has extended a presumption of reliance outside the context of securities cases. The "integrity of the market" is not at issue in this case, and AT&T did not owe these plaintiffs a fiduciary duty in the way that a broker may owe his client a fiduciary duty. Because the fraud-on-the-market cases are not on point, we are bound to follow Andrews and Pelletier. See Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (holding that a prior panel decision is binding on subsequent panels).

2.

In addition to presuming the reliance element, the district court determined – as part of the "scheme to defraud" – that "[LMAD] and its promotions appear to have been fundamentally unchanged and without material variation from the

---

[36] Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972), does not require a result different from the conclusion we reach in the text. Affiliated Ute held that, in a securities case, reliance was not a "prerequisite to recovery"; a plaintiff need only show that the defendant omitted facts that were material, "in the sense that a reasonable investor might have considered them important in the making of this decision." Id. at 153-54, 92 S. Ct. at 1472 (emphasis added); see also Basic, 485 U.S. at 245, 108 S. Ct. at 990 ("Requiring a plaintiff to show a speculative state of facts, i.e., how he would have acted if omitted material information had been disclosed, or if the misrepresentation had not been made, would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market.") (emphasis added) (internal citations omitted).

27

game's inception." The court further determined that "the few individualized inquiries which might be necessary on the issue of damages or individual claims cannot be said to predominate over the common issues here." We cannot agree with the court on either proposition.

a.

With regard to the scheme to defraud, the district court erroneously determined that LMAD and its promotions were "without material variation." The plaintiffs bear the burden of proving that the advertisement(s) upon which <u>each class member relied</u> was fraudulent and misleading. <u>See</u> <u>Beck v. Prupis</u>, 162 F.3d 1090, 1097 (11th Cir. 1998) (disallowing a civil RICO claim predicated on mail and wire fraud where the plaintiff failed to present any evidence "that he actually saw, let alone relied upon" any false statements). In this case, over 119 different commercials were broadcast on the U.S.A. Network alone. The advertising for LMAD included thirty-second commercials, two-minute commercials, thirty-minute "infomercials," print advertising (in the National Enquirer, newspapers, and local publications), and direct mail solicitations. The record indicates that few of these advertisements are still in existence,[37] that LMAD did not retain copies of all

---

[37] For example, only 12 of the 119 commercials on the U.S.A. Network have been produced in connection with this litigation.

28

of the advertising, that LMAD did not send copies of all of its advertising to AT&T prior to its use (despite a contractual obligation to do so), and that even the advertisements that remain in existence vary considerably in terms of content and language. The plaintiffs' own expert has conceded that those advertisements that are still available "vary in terms of their potential to deceive."[38]

The upshot of this is that each individual plaintiff is the only person with information about the content of the advertisement upon which he relied. Of course, a factfinder cannot determine whether an advertisement was misleading or fraudulent without knowing its content, and so each plaintiff will have to provide evidence of the particular advertisement(s) that he heard or saw. The court may not employ a presumption that all of the LMAD advertisements were misleading, because each individual plaintiff bears the burden of proving that the ad upon which he relied was misleading. Use of a presumption is improper because each individual plaintiff may be the only person with critical information about the content of the ad upon which he relied; this content is evidence necessary to determine whether the ad was misleading or fraudulent. Individual issues will therefore predominate over common issues.

---

[38] The plaintiffs' expert further testified that "some of the people that saw the ads could have called and understood a lot about [LMAD]; but I'm thinking that most of them, the large majority of them, were deceived." The expert also conceded that he would be unable to know which particular consumer would or would not be deceived by a particular ad.

b.

The district court employed a presumption on the plaintiffs' behalf on the issues of injury and damages, deciding to forgo an individualized inquiry on these elements of the plaintiffs' claims. The court did so despite the fact that applying the presumption would provide recovery to some persons who had not proved that they were injured as a result of LMAD, and, in some instances, would provide recovery in excess of the damages incurred by a class member. The court's rationale was that "such refunds would not significantly harm AT&T":

> Although Local Exchange Carriers (LECs) with whom AT&T contracted to collect the 900-number charges may have kept poor records in refunding money for some calls, also affecting the damages issue, such amounts may be insubstantial compared to the overall harm to the Plaintiffs' class. Besides, to the extent that some percentage of class members might receive a double recovery because the LECs have already given certain refunds for which no records were kept, such refunds would not significantly harm AT&T.

Although we could debate whether AT&T would be "significantly harm[ed]" by paying, in treble damages, money already recovered by a consumer,[39] we need not do so now, for the harm to AT&T is not relevant to the question of whether the plaintiffs' injuries and damages should be presumed.

---

[39] AT&T has presented evidence to the effect that, at one point in 1992, about 40% of the calls made to LMAD either were not paid or were credited by AT&T and the local exchange carriers.

30

A plaintiff suing under civil RICO must demonstrate injury as a result of racketeering activity and a specifiable amount of damages. See Andrews, 95 F.3d at 1025 (stating that class members must show, "on an individual basis, that they relied on the misrepresentations, suffered injury as a result, and incurred a demonstrable amount of damages"). To allow recovery by persons who have not been injured or to allow recovery for an injury greater than that caused by the offending conduct would run counter to the plain language of the statute. 18 U.S.C. § 1964(c) ("Any person injured . . . shall recover threefold the damages he sustains . . . .") (emphasis added); see also Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 497, 105 S. Ct. 3275, 3285, 87 L. Ed. 2d 346 (1985) (stating that a civil RICO defendant is not "'liable to those who have not been injured'" (quoting Haroco, Inc. v. Am. Nat'l Bank & Trust Co., 747 F.2d 384, 398 (7th Cir. 1984)). We reiterate that class treatment may not serve to lessen the plaintiffs' burden of proof.[40]

In this case, a list of all of the individuals who received a refund or credit or who refused to pay cannot be created from the records of AT&T, the local exchange carriers, or Teleline. As we have stated above, a presumption should be

---

[40] This is not to say that it would be impossible to certify any class because of damages problems. In cases involving damages that may be calculated by a reliable formula – such as overcharge cases or usury cases – damages are not much of a hurdle at all to certification.

employed only on behalf of a party who <u>does not</u> have control of the evidence on an issue. Each plaintiff in this case received telephone bills, and each plaintiff who suffered injury by paying for calls to LMAD would have access to a payment record, which would detail the amount paid (thereby establishing the amount of damages). A court may not employ a presumption on behalf of a party who has such evidence at his disposal.

These claims will involve extensive individualized inquiries on the issues of injury and damages – so much so that a class action is not sustainable. The district court presumably recognized this or it would not have employed a presumption on these issues to avoid having to decertify the class. We cannot condone the use of a presumption as a "shortcut" in resolving issues of injury and damages where such elements are provable by the plaintiffs and are required for recovery. <u>See</u> <u>Broussard v. Meineke Disc. Muffler Shops, Inc.</u>, 155 F.3d 331, 343 (4th Cir. 1998) (noting that the fact that a "shortcut was necessary in order for this suit to proceed as a class action should have been a caution signal to the district court that class-wide proof of damages was impermissible").

B.

AT&T also contests the propriety of the district court's certification of a

class with respect to the federal RICO claims predicated on illegal gambling,[41] in

---

[41] It is quite rare for a plaintiff to bring a civil RICO claim predicated upon illegal gambling. We have been unable to locate any such claims in the prior decisions of this court, and scarcely any in other circuits (although there are a few published district court cases). One possible reason for this, which we do not address in this opinion, is that it would be quite curious for a plaintiff to institute a RICO claim predicated on illegal gambling against a defendant, for the plaintiff would have to therein admit that he violated the gambling laws of a state. This is because while 18 U.S.C. § 1955 only applies to persons in charge of a gambling business with more than five persons, see infra note 42, one of the requirements for satisfying section 1955 is that the gambling business be "a violation of the law of the State or political subdivision in which it is conducted." This means that to prove his RICO claim, the plaintiff would have to show that the defendant violated the law of a state in which the gambling occurred. But since it takes two parties to gamble, plaintiffs would thus be proving that they participated in conduct that violated state law. (We recognize that there may be exceptions to this situation, such as in the instant case, wherein the plaintiffs allege that they were unwitting participants in illegal gambling; such plaintiffs would likely lack the requisite mens rea for prosecution under state law.) We do not pass on the issue, but we posit the possibility that the plaintiffs may be barred from bringing such a claim by the "unclean hands" doctrine.

violation of 18 U.S.C. § 1955.[42]  In a criminal prosecution instituted under section

1955, the government must prove three elements:

> first, the enterprise violates state law; second, the illegal gambling
> business involves five or more persons who conduct, finance, manage,
> supervise, direct or own all or part of such business; and third, the
> business was either in substantially continuous operation for a period
> in excess of thirty (30) days <u>or</u> had a gross revenue of $2,000.00 in a
> single day.

United States v. 18755 N. Bay Rd., 13 F.3d 1493, 1496 (11th Cir. 1994).  When a

civil RICO plaintiff attempts to base a RICO claim on illegal gambling, the

plaintiff must prove these same elements.  Additionally, the plaintiff must prove

---

[42] Section 1955 provides, in pertinent part:
(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part
of an illegal gambling business shall be fined under this title or imprisoned not
more than five years, or both.
(b) As used in this section –
    (1) "illegal gambling business" means a gambling business which –
        (i) is a violation of the law of a State or political
        subdivision in which it is conducted;
        (ii) involves five or more persons who conduct,
        finance, manage, supervise, direct, or own all or
        part of such business; and
        (iii) has been or remains in substantially continuous
        operation for a period in excess of thirty days or has
        a gross revenue of $2,000 in any single day.
    (2) "gambling" includes but is not limited to pool-selling,
bookmaking, maintaining slot machines, roulette wheels or dice
tables, and conducting lotteries, policy, bolita or numbers games,
or selling chances therein.
    (3) "State" means any State of the United States, the District of
Columbia, the Commonwealth of Puerto Rico, and any territory or
possession of the United States.

that he was "injured in his business or property by reason of" the illegal gambling. 18 U.S.C. § 1964(c); see also Price v. Pinnacle Brands, Inc., 138 F.3d 602, 607 (5th Cir. 1998) (holding that the plaintiffs did not have standing to bring a civil RICO claim predicated on illegal gambling because they failed to allege "a compensable injury"). Thus, just as the plaintiffs must prove injury and damages when predicating their RICO claim on mail and wire fraud, see Pelletier, 921 F.2d at 1499-1500, so too must they prove injury and damages when predicating their RICO claim upon illegal gambling.[43]

We have previously discussed, in Part III.A.2.b supra, the plaintiffs' difficulties in showing injury and damages as a class. These difficulties apply equally whether the predicate act is mail and wire fraud or illegal gambling. Thus,

---

[43] There is also no reason to differentiate the plaintiffs' federal RICO claim arising from the defendant's alleged collection of unlawful debt. The plaintiffs still must prove injury and damages, and the same difficulties arise with respect to unlawful debt collection as to claims of a "pattern of racketeering activity" predicated on mail or wire fraud or on illegal gambling. Further, the allegation that AT&T violated federal RICO by collecting unlawful debt would also turn on plaintiffs' establishing that debts incurred by participation in LMAD were "gambling debts." This raises the specter of applying the laws of fifty states, as described infra note 44.

18 U.S.C. § 1961(6) defines "unlawful debt":

"[U]nlawful debt" means a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

the class must be decertified on the illegal gambling claim because individual

issues will overwhelm any common issues.[44]

## IV.

In sum, the district court abused its discretion in certifying the plaintiff class

by erroneously determining that common issues of law or fact would predominate

---

[44] The parties devote much attention in their briefs to whether the district court would have to apply the laws of all fifty states, or the laws of only four states, in resolving the illegal gambling claims. (The plaintiffs contend that the court need apply only the laws of California (where Teleline's home office was located), Illinois (where some calls were answered and a relevant AT&T facility was located), New Jersey (where a relevant AT&T office was located), and Missouri (where most of the calls were answered).) The district court unequivocally ruled that the gambling laws of all fifty states would have to be applied: "In order to eliminate any confusion, I now conclude that the laws of each state from which a call was made . . . will be used to evaluate the gambling claims in this litigation." Appellant AT&T agrees with the district court's determination on choice of law; its only contention is that applying the laws of all fifty states is not "manageable" under Rule 23(b)(3). Plaintiffs contend that the laws of four states, at most, apply to these claims. The plaintiffs, however, have not cross-appealed the district court's determination on this issue. The plaintiff's failure to file a cross-appeal violates the requirement of Fed. R. App. P. 5(b)(2) and means that the plaintiffs have not preserved this issue for appeal. See United States v. Am. Ry. Express Co., 265 U.S. 425, 435, 44 S. Ct. 560, 564, 68 L. Ed. 1087 (1924) ("[T]he appellee may not attack the decree [of the district court] with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary" unless the appellee cross-appeals.); Tranello v. Frey, 962 F.2d 244, 248 (2d Cir. 1992) (holding that the failure to file a petition for cross-appeal within the statutory time limit is a jurisdictional defect that bars the court from hearing the cross-appeal); Freeman v. B&B Assocs., 790 F.2d 145, 151 (D.C. Cir. 1986) (holding that failure of an appellee to cross-appeal "ordinarily precludes review where an appellee seeks to enlarge his rights or lessen those of an adversary," but is not a jurisdictional bar); see also Harbor Tug & Barge, Inc. v. Belcher Towing Co., 733 F.2d 823, 825 n.1 (11th Cir. 1984); Campbell v. Wainwright, 726 F.2d 702, 704 (11th Cir. 1984).

Assuming that the district court was correct in ruling that the laws of all fifty states apply, that alone would render the class unmanageable. See Andrews, 95 F.3d at 1024; Castano v. Am. Tobacco Co., 84 F.3d 734, 741-43 and n.15 (5th Cir. 1996); In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293, 1300-01 (7th Cir. 1995).

36

over individual issues.  We therefore REVERSE the certification order and

REMAND for further proceedings consistent with this opinion.

SO ORDERED.