**BOCA RATON COMMUNITY HOSPITAL, INC., et al.,**
Plaintiffs,

v.

**TENET HEALTHCARE CORPORATION,**
Defendant.

No. 05–80183CIV.

United States District Court,
S.D. Florida.

Dec. 7, 2006.

Ann C. Turetsky, Hal M. Hirsch, John F. Triggs, Richard A. Edlin, Greenberg Traurig, Kenneth A. Lapatine, Camhy Karlinsky & Stein, New York, NY, Arthur R. Miller, Cambridge, MA, David A. Coulson, Hilarie Bass, Greenberg Traurig, Miami, FL, David K. Isom, Greenberg Traurig, Denver, CO, Robert P. Charrow, William B. Eck, Greenberg Traurig, Washington, DC, for Plaintiffs.

Brett Alan Barfield, Martha R. Mora, Peter Prieto, Sanford Lewis Bohrer, Scott Daniel Ponce, Holland & Knight, Miami, FL, Bridget K. O'Connor, Jay P. Lefkowitz, Patrick M. Bryan, Rebecca A. Koch, Susan E. Engel, Jennifer G. Levy, Karen Natalie Walker, Kirkland & Ellis, Washington, DC, for Defendant.

### MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION

SEITZ, District Judge.

THIS CAUSE is before the Court on Plaintiff Boca Raton Community Hospital

Inc.'s ("Boca's") Renewed Motion for Class Certification [DE–255] under Fed.R.Civ.P. 23(a) and (b)(3) ("Renewed Motion").[1] Boca's Renewed Motion asks the Court to certify a nation-wide class of over 3,000 acute care hospitals that allegedly suffered diminished Medicare reimbursements between the years 2000–2004 due to an alleged scheme by Defendant Tenet Healthcare Corporation ("Tenet") to increase its own reimbursements through questionable charging practices described by the parties as "turbocharging." Having considered the Renewed Motion, the response and reply thereto, the applicable case law and the oral argument of counsel at the November 3, 2006 hearing, the Court finds that Boca has not met its burden of establishing the requirements of Rule 23 needed to certify the proposed class. Notwithstanding Boca's diligent effort, and satisfaction of several of the Rule 23 prerequisites, its class definition does not rationally distinguish between culpable hospitals outside the class and innocent ones in it. Indeed, the fact that some of the hospitals in the putative class profited from the same kind of overcharging as Tenet (and therefore injured other class hospitals) undermines class cohesiveness and exposes serious class conflicts. As such, the Rule 23(a)(3)-(4) requirements of typicality and adequacy are not met. Furthermore, a class action is not the superior method for adjudicating these claims, as required by Rule 23(b)(3), because the differences among potential class hospitals generate individual interests in controlling the prosecution of separate cases or groups of cases. Accordingly, for the reasons set forth herein, Plaintiff's Renewed Motion for Class Certification is denied.

## I. BACKGROUND

### A. Overview of the Alleged Scheme

This case stems from an alleged scheme by Tenet, one of the largest health care provider networks in the country, to obtain hundreds of millions of dollars in excessive Medicare reimbursements from the federal government under what is known as the Medicare Outlier Cost System (the "outlier program").[2] The alleged scheme took advantage of certain shortcomings or "loopholes" in the outlier program (subsequently closed by regulatory amendment in 2003) which enabled any eligible hospital to increase its Medicare reimbursements simply by charging higher prices for its medical services without a corresponding increase in the cost of those services (i.e. "turbocharging").[3] What allegedly ensured the success of Tenet's scheme was the fact that the outlier program paid out reimbursements for exceptionally costly cases ("outliers") using a hospital's *charges*

---

**1.** After holding a hearing on Plaintiff's initial Motion for Class Certification [DE–114] ("Initial Motion"), the Court granted Plaintiff's motion to amend its class definition and file the instant Renewed Motion. *See* DE–250.

**2.** The statutory basis for the outlier program is codified at 42 U.S.C. § 1395ww and its implementing regulations are contained at 42 C.F.R. § 412.80, 84.

**3.** The precise definition of "turbocharging" is subject to some dispute between the parties. Early in the case Boca used "turbocharging" as shorthand for an increase in hospital charges without a corresponding increase in the cost for those services. *See, e.g.,* DE–118, (Pl. MSJ Mem.) p. 2 n. 3 ("The plaintiffs have alleged that Tenet exploited [the outlier program] and obtained outlier payments to which they were not entitled by rapidly increasing charges far in excess of any corresponding increase in associated costs. (The United States refers to this practice as 'turbocharging.')") (citing *Amicus Curiae* Memorandum of the United States in Response to Tenet's Motion to Dismiss). Boca's new class definition and its Renewed Motion now seem to more narrowly define "turbocharging" as intentionally overcharging so that a hospital's cost-to-charge ratio falls below a certain defined level known as the low National Threshold line. *See, e.g.,* Renewed Motion at 11–12 & n. 11 ("As used in the DaVanzo Report and herein, 'turbocharging' refers to Tenet's practice of intentionally inflating gross charges to increase Medicare operating cost Outlier payments by driving the cost of [sic] charge ratio ('CCR') *down below the low National Threshold.*") (emphasis added); *see also* Pl. Reply in Support of Renewed Motion ("Reply II") at 9 ("hospitals with CCRs that are *above the low National Threshold line* have not engaged in wrongful conduct under Plaintiff's liability theory."). Where to draw the line between innocent overcharging and "turbocharging" is not a question that is properly before the Court in this motion. Nonetheless, because Boca's class definition incorporates its proposed definition of turbocharging, the Court must confront Boca's liability theory insofar as it implicates the Rule 23 analysis.

as a surrogate for its *costs*. As the then-existing outlier program operated, a case with high charges was effectively treated as if it was really a case with high costs, regardless of whether costs were high at all.

Boca claims that Tenet's turbocharging resulted in Tenet receiving excessive outlier reimbursements. These excessive reimbursements in turn caused the agency in charge of the outlier program ("CMS") to increase the threshold used to determine how costly a case must be to qualify as an outlier, and ultimately how much money to reimburse for those outlier cases. As this threshold, known as the Fixed Loss Threshold ("FLT"), increased each year over the class period, hospitals had to bill more for their cases before CMS would pay out outlier reimbursements. Hospitals that charged for their services based on a closer relationship to their actual costs found they could not compete for outlier reimbursements with hospitals that indiscriminately raised their charges without reference to costs. According to Boca's theory, because Tenet's turbocharging caused the FLT to increase, Tenet thereby deprived Boca, and the class of outlier-eligible hospitals it seeks to represent, of outlier reimbursements they would otherwise have received in a world with a lower FLT.

## B. The Medicare Outlier Program as it Existed During the Proposed Class Period

Medicare is a system of health insurance for the nation's aged and disabled administered by the United States Department of Health and Human Services, through the Center for Medicare and Medicaid Services ("CMS"). *See United States v. R & F Properties of Lake Co., Inc.*, 433 F.3d 1349, 1351 (11th Cir.2005). Medicare covers nearly 40 million beneficiaries. *See http://www. medicare.gov/Basics/Overview.asp* (last visited Dec. 6, 2006). The relevant provisions of Medicare set forth a system of payments for the operating costs of acute care hospital inpatient stays. Since 1983, the Medicare reimbursement system has operated under what is known as the Prospective Payment System. *See County of Los Angeles v. Shalala*, 192 F.3d 1005, 1008–09 (D.C.Cir.1999); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C.Cir.1994). Under this system, a hospital is reimbursed at a fixed rate for its services regardless of the hospital's costs, thereby creating an incentive to keep costs in check. *See Fischer v. United States*, 529 U.S. 667, 685, 120 S.Ct. 1780, 146 L.Ed.2d 707 (2000). The fixed reimbursement rate is based on the patient's diagnosis, or diagnosis-related group ("DRG"). In a nutshell, Medicare pays each hospital a predetermined average cost reimbursement for a particular DRG (a "DRG payment"), adjusted for various factors like the geographic location of the hospital, local cost of living, wage rates and the like.[4]

The outlier program, the program at issue in this case, was designed to supplement the basic fixed reimbursement scheme described above. Whereas the basic DRG payment system sets reimbursements for each DRG based on the average cost to treat that diagnosis, the outlier program recognizes that some cases will inevitably fall well above the average in terms of costs. The outlier program was designed to protect hospitals from large financial losses due to extremely costly cases which the DRG payment (or average cost estimate) cannot fairly accommodate. As such, the outlier program acts as a financial backstop for Medicare claimant hospitals by paying out additional reimbursements for exceptionally costly cases.

Under the outlier program, a hospital may receive these additional outlier payments when the costs it incurs to treat a patient exceed the standard DRG payment by a

---

4. To be precise, annually CMS calculates national standardized amounts for all reimbursements. *See* 68 Fed.Reg. 10420, 10421 (Mar. 5, 2003). These standardized amounts are designed to approximate the average cost per case for all DRG cases. Once established, these national standardized amounts are then adjusted for various hospital-specific factors, resulting in hospital-specific standardized amounts. *See* 68 Fed.Reg.

34493 (June 9, 2003). A DRG payment is then calculated by multiplying the standardized amounts by the particular DRG factor. *See Shalala*, 192 F.3d at 1009–10 ("To calculate the final 'DRG prospective payment rate' for a patient discharge, the Secretary takes the federal rate, adjusts it according to the wage index, and then multiplies it by the weight assigned to the patient's DRG.").

fixed amount. *See* 42 U.S.C. § 1395ww(d)(5); 42 C.F.R §§ 412.80, 412.84; *Shalala,* 192 F.3d at 1009. Specifically, the statute authorizes additional payments "in any case where charges, adjusted to cost, ... exceed the sum of the applicable DRG prospective payment rate plus [other fixed adjustments] plus a fixed dollar amount determined by the Secretary." 42 U.S.C. § 1395ww(d)(5)(A)(ii). Setting aside the hospital-specific adjustments, which are inessential to an understanding of this lawsuit, an outlier payment is calculated under the outlier program in the following manner. The fixed DRG payment is subtracted from the total cost of the case. When the costs exceed the standard DRG payment, then the hospital must absorb these extra costs, unless the extra costs are so extraordinary that they exceed the Fixed Loss Threshold or "FLT." If they exceed the FLT, then the case is considered a cost outlier and the hospital is eligible to receive a certain percentage of those costs that fall above the FLT as outlier reimbursements. Throughout the class period, the percentage reimbursement was 80%. Stripped to its crudest equation form, an outlier is calculated in the following manner: Outlier Payment = (.80) × [Costs—DRG Payment—FLT].

### 1. Cost–to–Charge Ratio

While the outlier program is designed to compensate hospitals for their extremely costly cases that fall well above the average cost, during the proposed class period outlier payments were not calculated according to actual costs for the services. Instead, a hospital's costs were approximated by multiplying its charges (i.e., what it billed its patients) by its cost-to-charge ratio ("CCR"). *See* 42 U.S.C. § 1395ww(d)(5)(A)(ii); 42 C.F.R. § § 412.84(g), (h). A hospital's CCR reflects (in decimal form) the ratio between its costs and its charges. So, for instance, if a hospital were to charge $1000 for services that cost $400, its cost to charge ratio would be 0.40 (or 400/1000). By comparison, if a hospital were to charge $2000 for those same services that cost $400, its CCR would be 0.20 (400/2000). As such, when billed charges rise faster than costs, a hospital's CCR will decline.[5]

Once a hospital's CCR is determined, its costs for a particular case can be approximated by multiplying its billed charges by its CCR. Thus, refining the outlier payment calculation to include the use of billed charges and CCRs instead of actual costs, the basic formula for determining outliers becomes: Outlier Payment = (.80) × [ (Billed Charges × CCR)—DRG Payment—FLT]. *See* Am. Compl., ¶ 48.

A hospital's CCR is derived from its most recent audited or "settled" cost report.[6] Importantly, because it took significant time to audit and settle a hospital's cost reports, the CCR used to calculate a particular hospital's outlier payments did not necessarily reflect the hospital's current charges or costs for a particular case. *See* 68 Fed.Reg. at 34500–01.[7] In fact, in practice a hospital's cost reports were not settled for as many as two to five years, making its CCR outdated by as many years. This meant that during the class period an increase in billed charges without a corresponding increase in costs would result in the appearance that costs had increased because the hospital's charge in-

---

**5.** Example of Decreasing CCRs Due to Increased Charges Without Increased Costs

| Cost Year | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|
| Cost | $ 400 | $ 400 | $ 400 | $ 400 |
| Billed Charges | $1000 | $1500 | $2000 | $2500 |
| CCR | 0.40 | 0.27 | 0.20 | 0.16 |

*See* DE–258, Ex. A (DaVanzo Report) at 12.

**6.** A cost report is settled once it has been audited by a fiscal intermediary. A fiscal intermediary is an agent (usually a private insurance company) that acts on behalf of CMS in implementing the Medicare Program. *See* 42 U.S.C. § 1395h(a).

**7.** At the end of the cost reporting period, Medicare charges from all Medicare claims for the cost reporting period are accumulated through the Provider Statistical and Reimbursement Report (PS & R). The PS & R contains data such as the number of discharges and the actual billed charges from each hospital. *See* 68 Fed.Reg. at 10423. The hospital also submits a cost report to its fiscal intermediary. A cost report is a report of, *inter alia*, a hospital's aggregate Medicare costs for a cost reporting period, typically a hospital fiscal year. *Id.* Once all this information is available, the fiscal intermediary then determines the CCR for the hospital by using the charges from the PS & R and the costs from the cost report. *Id.*

crease would not immediately cause its CCR to decline.

## 2. Fixed Loss Threshold

The FLT is a dollar amount threshold that distinguishes an exceptionally costly outlier case from a normal DRG case. If a hospital incurs costs above the basic DRG payment level, and those additional costs exceed the FLT, then the case is an outlier and the hospital can recover 80% of the additional costs as an outlier reimbursement. The CMS establishes the FLT annually by rule-making according to a methodology which estimates what FLT level will keep total outlier payments within the statutory limits. CMS is constrained by statute to make outlier reimbursements at no less than 5% and no more than 6% of the total aggregate DRG payments for any given year. *See* 42 U.S.C. 1395ww(d)(5)(A)(iv). For the years at issue in this case, the total outlier payment target was set by CMS at 5.1%. *See* 68 Fed.Reg. at 34501. Although CMS set the FLT at a level designed to pay out only 5.1% of total DRG payments, CMS in fact paid out more than 5.1% for each year of the proposed class period. *See, e.g.,* 68 Fed.Reg. at 10423. Indeed, despite the statutory mandate not to pay out more than 6%, CMS paid out between 6.1% and 7.6% for the four years at issue in the proposed class period. *See* 68 Fed.Reg. 34496.

According to Boca, CMS calculated the FLT for any given year using an "iterative process." *See* DE–258, Ex. A (DaVanzo Report) at 15. As Boca's counsel explained at the certification hearing, CMS began with an educated guess about what FLT level would meet the target total outlier payment of 5.1%. CMS then used that "best-guess" FLT to estimate total outlier payments by calculating the predicted number of claims for the upcoming year based on historical data. If the estimated total payments exceeded 5.1%, then CMS would adjust the FLT upward to reduce the predicted overall payments. CMS proceeded in this trial and error fashion until it found the proper estimated FLT level that would result in predicted total outlier payments of 5.1%. Despite its best efforts at predicting the appropriate FLT for

each year, CMS consistently missed the 5.1% and 6.0% targets and therefore had to increase the FLT each year throughout the class period. The FLT increased from $14,600 in 2000 to $17,550 in 2001, then to $21,025 and $33,560 for the years 2002 and 2003, respectively. *See* 68 Fed.Reg. 34496. Thus, despite an ever increasing FLT over the class period, CMS was consistently paying out more outlier reimbursements than it expected, and more than the Medicare statute allowed.

## 3. The National Threshold

Near the end of each of its fiscal years during the class period, CMS calculated a national average of all hospitals' settled CCRs. Using this national average, CMS calculated a high and a low National Threshold CCR—the low National Threshold was calculated as three standard deviations *below* the national average settled CCR, and the high National Threshold was calculated as three standard deviations *above* the national average settled CCR. 53 Fed.Reg. 38476, 38503 (Sept. 30, 1988). CMS assumed that hospital-specific CCRs falling outside this range—three standard deviations above and below the national average CCR—were "unreasonable, in that they [we]re probably due to faulty data reporting or entry, and should not be used to identify and pay for cost outliers." 53 Fed.Reg. at 38503. Therefore, during the class period, if a hospital's settled CCR fell below the low National Threshold (or was above the high National Threshold), CMS instructed fiscal intermediaries to use a state-wide average ("SWA") CCR in lieu of the hospital-specific CCR for purposes of calculating outlier payments. *See* 67 Fed. Reg. 49982, 50125 (Aug. 1, 2002); *see also* 53 Fed.Reg. at 38503 (proposing use of the SWA CCR for those hospitals whose CCRs fell more than 3 standard deviations above or below the National Threshold). The SWA CCR was calculated as the weighted average of hospital-specific CCRs in a given state. Therefore, if a hospital's settled CCR fell below the low National Threshold it was assigned a higher SWA CCR by its fiscal intermediary and that hospital would then receive more outlier payments than if its own settled CCR had been used.

## C. CMS Promulgated New Rules Governing the Outlier Program in 2003

In March 2003, CMS proposed regulatory changes to the outlier payment system. *See* 68 Fed.Reg. at 10420. These proposals were adopted in a set of final regulations effective on a prospective basis on August 8, 2003. *See* 68 Fed.Reg. at 34494. CMS made three key changes to the outlier payment system.

First, the amendments allow the fiscal intermediary to calculate outlier payments using a cost-to-charge ratio based on a more current cost report. *See* 42 C.F.R. § 412.84(i)(2). In particular, CMS instructed (for discharges occurring on or after October 1, 2003) that the operating and capital cost-to-charge ratios applied at the time a claim is processed must be based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period. 42 C.F.R. § 412.84(i)(2). CMS explained that this would tie outlier payments more closely to actual costs, because the hospital's billed charges (which reflect charge increases) would be adjusted by cost-to-charge ratios that also reflected recent charge increases. *See* 68 Fed.Reg. at 34497.

Second, CMS "remove[d] the existing requirement that a fiscal intermediary [ ] assign a hospital the statewide average cost-to-charge ratio when the hospital has a cost-to-charge ratio that falls below the floor." 68 Fed.Reg. at 34500. Thus, "[h]ospitals will receive [outlier payments based on] their actual cost-to-charge ratios, no matter how low their ratios fall." *Id.*; *see also* 42 C.F.R. § 412.84(i)(3).

Third, CMS made outlier payments subject to reconciliation on a case-by-case basis. *See* 42 C.F.R. § 412.84(i)(4). CMS explained that this would ensure that "outlier payments would be based on the relationship between the hospital's costs and charges at the time a discharge occurred." 68 Fed.Reg. at 34501.

The amended outlier payment regulations thus implemented a formula designed to "ensure that when final outlier payments are made, they … reflect an accurate assess-ment of the actual costs the hospital incurred." *Id.* CMS, however, did not "make retroactive adjustments to outlier payments to ensure total payments [to all hospitals] are 5.1 percent of [all inpatient spending]," *id.* at 34502, and provided that the amended outlier payment regulations would apply prospectively. 42 C.F.R. § 412.84(h); *see also* 68 Fed.Reg. at 34512, 34515.

## D. Boca's Theory of Liability

Boca alleges that between 1999 and 2003 Tenet engaged in a scheme to increase its outlier payments by dramatically increasing the amounts it charged for its hospital services. *See* Am. Compl. ¶ 75. Tenet thereby transformed its ordinary cases into apparently more costly outlier cases, even though the cost of Tenet's hospital services did not significantly increase to justify the increased charges. *See* Renewed Motion at 2. According to Boca, Tenet's outlier reimbursements rose from approximately $231 million in 1999 to almost $831 million in 2003. *See* DE–258, Ex. A (DaVanzo Report) at 22. Tenet's "success" at increasing its outlier reimbursements flowed from the fact that its hospitals' CCRs were out of date and did not reflect its dramatic price increases, and because many of Tenet's hospitals with CCRs below the low National Threshold had their CCRs increased to the higher SWA CCR. Boca claims that since Tenet's charge increases were unrelated to any actual increase in costs (i.e., it turbocharged), the outlier funds received from those increased charges were unlawful and constitute a RICO theft in violation of 18 U.S.C. §§ 1962(c) and 1962(d). As the RICO predicate acts, Boca alleges that Tenet transported or received stolen or converted outlier funds in violation of 18 U.S.C. §§ 2314 and 2315.

As a central feature of Boca's theory of liability, and its class definition, Boca distinguishes Tenet's charge increasing conduct from the charge increases of other hospitals by focusing on the fact that many Tenet hospitals' charge increases caused their CCR's to drop below the low National Threshold.[8] According to Boca, charging

---

**8.** Boca alleges that 76 Tenet hospitals had CCRs at or below the low National Threshold line for at least one year in the class period. *See* DE–258, Ex. A (DaVanzo Report, Attachment 4) at

conduct that resulted in a CCR below the low National Threshold is theft, but charging conduct is not unlawful so long as the hospital's CCR stays above CMS's low National Threshold line.

Boca claims that it and other acute care hospitals were injured by Tenet's turbocharging because Tenet's excessive outlier reimbursements forced CMS to increase the FLT over the class period in an effort to keep total outlier payments in line with the statutory limit. *See* Am. Compl. ¶¶ 81–83. Because Tenet's turbocharging increased the FLT over those years, Boca maintains that it and the other class member hospitals lost out on outlier reimbursements for their own cases. In order to prove damages to the class, Boca's experts purport to isolate how much Tenet's turbocharging increased the FLT for each year of the given class period and then recalculate outlier reimbursements for all the class hospitals using a "Tenet-adjusted FLT." *See* Renewed Motion at 8 ("the damages to the Class can be reasonably calculated by simulating what CMS did to determine the FLT and then correcting for Tenet's conduct to derive a 'Tenet-adjusted FLT.' "); *see also id.* at 12 ("in sum, Dr. DaVanzo's damages calculation is based on adjusting the FLT to correct for the Tenet Hospitals with CCRs that were driven below the low National Threshold CCR."). Boca's experts claim to isolate Tenet's conduct by replacing Tenet's settled CCRs (the ones CMS used) with Tenet's "actual" or unsettled CCRs. *See* DE–258, Ex. A (DaVanzo Report) at 25. Boca's experts calculate that the class hospitals would have received approximately $660 million in additional outlier reimbursements but for Tenet's turbocharging. *See id.* at 30. Boca ultimately seeks an award in excess of a billion dollars after trebling of damages under RICO.[9]

## E. Pertinent Procedural History

In its Initial Motion for class certification, Boca asked the Court to certify a class of "all acute-care hospitals in the United States" that received Medicare payments and "were eligible, or would have been eligible but for Defendant's conduct, to seek reimbursement for Outlier costs for any of the cost years ending 2000 through 2004." *See* Initial Motion [DE–114] at 1. In its opposition, DE–289, Ex. A, Tenet argued, among other things, that Boca's class definition suffered from a critical defect in ascertainability, namely that the definition was circular and required a determination of liability in order to determine class membership. In other words, it was impossible to tell which hospitals were in the proposed class because the defining characteristic of class membership was being injured by Tenet, a characteristic that could not be determined before rendering a judgment on liability. This definition was especially problematic because Boca's theory of liability at the time was simply that Tenet's charges lacked any rational relationship to its costs. The original class definition, therefore, would have required a determination of what level of overcharging was unlawful prior to identifying which hospitals were in the class.

Several days before the scheduled hearing on the Initial Motion for certification, Boca moved to amend its class definition to address these concerns. *See* DE–245 (Pl.'s Mot. for Leave to Amend the Class Definition). At the hearing, Boca moved orally to withdraw its Initial Motion. *See* DE–250 (Order Following Class Hearing). The

---

23. For only 22 of those, however, were the hospitals' CCRs actually reset to the SWA CCR. *See* DE–289, Ex C (Palmer Report) at ¶ 12. Boca explains that 76 Tenet hospitals are liable, rather than only 22, because Boca's theory of liability is founded on the low National Threshold line rather than the SWA CCR. *See* DE–259, Ex. E (Dobson Report) at 8 ("Because the wrongful conduct is defined as inflating charges to the point where the CCR is less than the low National Threshold, it is irrelevant to the determination of the harm caused by the wrongful conduct whether or not the hospital was reset to the SWA.").

9. In addition to Boca's case, the United States filed suit against Tenet in the United States District Court for the Central District of California. There, the government sought to recover excessive outlier funds paid to Tenet as a result of, *inter alia,* Tenet's alleged scheme to increase outlier reimbursements by increasing charges without relation to costs. *See* DE–258, Ex. B (redacted Settlement Agreement). The government's case settled in June of 2006 for $900 million. *See id.* at 6.

Court granted Boca's motions for leave to amend the definition and to withdraw its original motion. *Id.*

Boca now moves to certify a proposed class that includes any acute care hospital that received at least one outlier payment during the class period, as long as the hospital's CCR was not below the low National Threshold. *See* Renewed Motion at 1 & n. 1 (citing Am. Compl. ¶¶ 7–8).[10] As reflected in its new definition and exclusions, which Boca describes as "symmetrical" to its liability theory, *see* DE–293 (Pl. Reply Mem. in Support of Renewed Motion) ("Reply II") at 4, Boca now defines the wrongful conduct as "breaking any rational or reasonable relationship between charges and costs *by driving hospital CCRs below the low National Threshold.*" Reply II at 1 (emphasis added); *see also id.* at 3 ("Tenet intentionally increased charges *to drive hospital CCRs below the low National Threshold* ... in order to gain additional outlier payments and in so doing Tenet broke any reasonable or rational relationship between charges and costs...") (emphasis added); *id.* at 9 ("hospitals with CCRs that are *above the low National Threshold line* have not engaged in wrongful conduct under Plaintiff's liability theory."). The key to Boca's new class definition, and the liability theory upon which it is based, is the low National Threshold line, which operates as the dividing line between those hospitals that are liable (and outside the class) and those that are victims (and in the class).

## F. Tenet's Objections

Tenet opposes certification. Its main objection, which takes several forms throughout its papers, is that the abuse of the outlier program identified by Boca, and subsequently eliminated by CMS's regulatory amendment, was rampant throughout the healthcare industry during the class period. Tenet's principal argument is that

the majority of hospitals in the class (as many as 80%) increased their charges over the class period out of proportion to their costs, sometimes as rapidly as Tenet. The result was increased outlier payments for a large swath of hospitals within the class. As such, each hospital that raised charges out of proportion to costs during the class period also "caused" CMS to increase the FLT. Therefore, Tenet asserts that many hospitals in the proposed class made outlier reimbursements more difficult for other hospitals to obtain. While the record evidence indicates that Tenet may have been one of the most, if not the most, egregious turbochargers, the difference between its conduct and that of other hospitals is simply a matter of degree. And since the rise in the FLT was caused by the industry as a whole, only a small percentage of the hospitals in the class are truly blameless.

According to Tenet, these facts undermine class certification in several fundamental ways. First, Boca's definition is arbitrary and unfair because it draws an unreasonable and unsupportable distinction between "innocent hospitals" that are included in the class, and "culpable" hospitals outside the class. While the low National Threshold line that Boca uses to impose liability and define class membership arguably identifies hospitals with the most disproportional charges compared to costs, the low National Threshold line was never intended to define culpability or set the standard between reasonable and unreasonable charges.

Second, the arbitrary nature of the class definition, coupled with the similar conduct of many hospitals within the class, creates fundamental conflicts between and among the class members. Hospitals that benefitted from the same conduct as Tenet cannot be part of a class that seeks to impose liability and recover damages for that conduct. In

---

10. Boca's proposed class definition includes:

> all acute care hospitals in the United States which received Medicare Part A payments under the Social Security Act ("SSA") § 1886(d) and received at least one Medicare cost outlier payment for any of the cost years ending 2000 through 2004 ("Class Period").

Am. Compl. ¶ 7, DE–253. The proposed class excludes any Tenet affiliated hospitals, and any other hospital if its *actual or unsettled* CCR fell below the low National Threshold for that year. Am. Compl., ¶ 8. The class definition also excludes any hospitals that are owned by a county, special district or governmental entity within the State of Florida. *Id.*

addition, given the divergent charging practices of the proposed class hospitals (as reflected in their differing CCRs, for example), different theories of liability or different damage models would treat the class plaintiffs differently. For example, hospitals with stable CCRs (that did not decline or that declined more slowly than other hospitals) over the class period would benefit from a more expansive definition of liability based on a higher standard of unreasonable charging than the low National Threshold line that Boca uses. Similarly, a damages model that uses *all* class hospitals' actual CCRs in recalculating outlier payments, rather than just using Tenet's actual CCR as Boca proposes, would benefit hospitals differently, depending on the variation between the particular hospital's actual and settled CCR. In sum, the various hospitals' conflicting interests undermine the coherence of the class, destroy Boca's typicality and expose serious class conflicts among the potential class plaintiffs.

Finally, Tenet argues that Boca's theories and methodologies for determining liability and calculating damages are implausible, and that class action treatment is not the superior means of adjudicating Boca's claims, as required by Rule 23(b)(3). Given these and other problems, Tenet argues that certification under Rule 23 is not warranted.

## II. Class Certification Standard

To certify its proposed class, Boca bears the burden of satisfying all four requirements of Fed.R.Civ.P. 23(a) as well as the requirements of Fed.R.Civ.P. 23(b)(3). *See Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1188 (11th Cir.2003); *Rutstein v. Avis Rent–A–Car Systems, Inc.,* 211 F.3d 1228, 1232 (11th Cir.2000). Rule 23(a) requires Boca to demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of

the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).[11] Rule 23(b)(3) requires Boca to establish that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P 23(b)(3). Failure to satisfy any one of these requirements precludes class certification. *Valley Drug,* 350 F.3d at 1188 (citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 615–18, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

Boca also must have standing in order the represent the class. *Id.* at 1188; *Prado–Steiman v. Bush,* 221 F.3d 1266, 1279 (11th Cir.2000).[12] In addition, Rule 23 implicitly requires that "the class sought to be represented must be adequately defined and clearly ascertainable." *Adair v. Johnston,* 221 F.R.D. 573, 577 (M.D.Ala.2004) (quoting *De-Bremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970) (*per curiam*)); *see also Neumont v. Monroe Co., Fla.,* 198 F.R.D. 554, 556–57 (S.D.Fla.2000).

District courts are invested with significant discretion in deciding whether to certify a class. *Klay v. Humana, Inc.,* 382 F.3d 1241, 1251 (11th Cir.2004). In exercising its discretion under Rule 23, a court may not pass on the merits of a case, only the procedural requirements for class certification. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Cooper v. Southern Co.,* 390 F.3d 695, 713 (11th Cir.2004). Nonetheless, it is within a court's discretion to consider the merits of the claims in order to determine whether the requirements of Rule 23 are satisfied. *See Heffner v. Blue Cross Blue Shield of Alabama, Inc.,* 443 F.3d 1330, 1337 (11th Cir. 2006); *Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir.1984). Furthermore, courts

---

**11.** These four requirements are commonly referred to as the numerosity, commonality, typicality and adequacy factors. *See Prado–Steiman v. Bush,* 221 F.3d 1266, 1278 (11th Cir.2000). For convenience, the Court will use these shorthand expressions throughout this opinion.

**12.** The Court previously addressed Boca's RICO standing. *See* Order on Defendant Tenet Healthcare Corporation's Motion to Dismiss [DE–83], at 11–16 (rejecting argument that Boca lacks standing to bring RICO claims).

may consider any evidence submitted that bears on the question of certification. *See Cooper*, 390 F.3d at 713–14. With these principles in mind, the Court turns to the parties' arguments.

## III. ANALYSIS

### A. Boca's Class Definition is Arbitrary and Unfair.

 Tenet argues that Boca's proposed class may not be certified because the underlying class definition is arbitrary and unfair in that there is no legal or factual basis for using the low National Threshold line to distinguish between hospitals that are in the class and those that are not. Tenet concedes that Boca's focus on the low National Threshold line solves the ascertainability problems inherent in Boca's original class definition. By eliminating the "but for" language of the original definition and highlighting the low National Threshold line, it is now straightforward enough to tell by objective measures which hospitals are in the proposed class and which are not.[13] Tenet contends, however, that the reformulated class definition exposes new and equally fundamental problems that preclude certification. In sum, Tenet argues that Boca's reliance on the low National Threshold line creates objectivity at the expense of rationality and fairness. This fact, in turn, undermines the certification prerequisites of typicality and adequacy, as will be discussed later.

The low National Threshold does not provide a rational demarcation for purposes of defining hospitals in and out of the class. Boca's class definition simply assumes without sufficient explanation or authority that hospitals with "unaudited" or "unsettled" CCRs that fell below the low National Threshold line engaged in unlawful turbocharging, whereas those hospitals whose

"unaudited" or "unsettled" CCRs remained above that line did not.[14] There is little basis in law or fact for Boca's assumption for the following six reasons.

*First*, there is little textual support in the statute or regulations for Boca's position. The only authority that Boca proffers to defend its class definition is language from the Federal Register describing CCRs below the low National Threshold as "unreasonable." *See* Reply II at 5 & n. 6 (quoting 53 Fed.Reg. at 38503). However, the quoted language from the Federal Register is not a statement about the *lawfulness* of CCRs below the low National Threshold line. Even with respect to the question of reasonableness, the quoted statement does not say that CCRs below the low National Threshold line are unreasonable because they are the result *of improper charging practices*. Reading the Federal Register statement in context, it is apparent that CMS considered a CCR falling below the low National Threshold line to be the result of reporting or data entry errors, not turbocharging.[15]

*Second*, had CMS focused on turbocharging, it is quite possible that the standard for unreasonable charging may well have been much higher than the standard for identifying reporting errors. As far as the Court is aware, or the parties have cited, CMS has never taken a position on what level of overcharging is unlawful or unreasonable. However, what the Department of Justice has said on the subject, as *amicus curiae* in this case, is that the low National Threshold line is "not a magical point where you separate turbochargers from non-turbochargers." *See* DE–289, Ex. D (June 5, 2006 Class Hearing), Tr. at 171; *see also id.* at 30 (counsel for the government answered in the affirmative the Court's question about whether hospitals with CCRs above the low National Threshold line could also be "gaming the system").

---

**13.** Boca presents such a list based on historical CMS data. *See* DE–246, Ex. A (class list).

**14.** An "unaudited" CCR, or "actual" CCR as Boca refers to it, means simply a CCR not reviewed and "settled" by CMS or CMS's fiscal intermediary. It reflects a hospital's actual cost and charge data from a particular year, rather than outdated (but reviewed and settled) cost and charge data.

**15.** The passage from the Federal Register expresses CMS's "belie[f] that [settled cost-to-charge] ratios falling outside this range [*i.e.*, below the low National Threshold] are unreasonable, in that they are probably *due to faulty data reporting or entry*, and should not be used to identify and pay for cost outliers." 53 Fed.Reg. at 38503 (emphasis added).

*Third,* even if the text could be read to represent CMS's views on charging practices, the statement does not purport to say that *only* CCRs falling below the low National Threshold are unreasonable or improper. The low National Threshold line merely represents CCRs that are more than three standard deviations below the national mean of settled CCRs. *See* 53 Fed.Reg. 38476, 38503 (Sept. 30, 1988). Therefore, at best, the low National Threshold line captures hospitals with the lowest settled CCRs. But it is not a line that purports to limit unreasonableness to *only* those CCRs three standard deviations from the national average. Accepting Boca's class definition would therefore require the Court to distinguish "innocent" hospitals from culpable ones even if the difference in their cost-to-charge ratios is less that one percent. Boca's definition would place a hospital with a CCR only .01 *below* the low National Threshold line outside the class and subject to liability, but would place a hospital with a CCR only .01 *above* the line within the class and award them damages. As such, the Court cannot accept Boca's assertion that the low National Threshold "has reasonably screened out hospitals (and hospital systems) that had engaged in the same outlier misconduct upon which Plaintiff seeks to hold Tenet liable." Reply II at 1. As discussed below, the factual record does not support the view that all hospitals that increased charges disproportionally to costs and caused an increase in the FLT are screened out of the proposed class.

*Fourth,* Tenet also points out that the regulations applicable during the class period required fiscal intermediaries to assign a higher statewide average cost-to-charge ratio to those hospitals that dropped below the low National Threshold, thereby increasing the hospital's outlier payments. *See* 42 C.F.R. § 412.84(h); 53 Fed.Reg. at 38503. If CMS intended the low National Threshold line to represent the point at which hospitals had acted unlawfully or unreasonably, which is Boca's theory, then CMS would never have

*rewarded* those hospitals with additional outliers. Rather, CMS would have imposed some mechanism to deter such conduct, not encourage it.

*Fifth,* Boca's proposed class definition is also unrealistic because it is based on hospitals' *unsettled,* rather than *settled,* CCRs. Throughout the proposed class period, though, CMS computed hospitals' CCRs based on *settled* cost report. 42 C.F.R. § 412.84(h). Likewise, CMS set the low National Threshold line at three standard deviations below the national mean of *settled* CCRs. Boca has not explained the rationale for comparing unsettled CCRs to a settled CCR-based standard.

*Finally,* even if Boca's class definition stood on firmer legal footing, the facts are that many hospitals engaged in questionable, aggressive charging conduct and impacted the FLT even though their CCRs did not fall below the low National Threshold line. This undercuts Boca's use of the low National Threshold line as a basis for defining the proposed class. For instance, more than 300 class hospitals had sharp price increases and high outlier reimbursements even though their CCRs never quite fell below the low National Threshold line.[16] As one particular example, charges at Deborah Heart & Lung Center increased by 54% and 60% in cost years 2001 and 2002, respectively, while its costs increased only 9% and 12%. As a result, Deborah Heart & Lung's outlier payments shot up 381% in 2001 and increased another 155% in 2002. Yet, although its CCR decreased from .449 in 2000 to .199 in 2003, it never dipped below the low National Threshold line. *See* DE–289, Ex. G (Palmer Decl.) (attached lists). It is therefore a member of Boca's proposed class, and stands to recover even more outlier reimbursements as a damage award, despite its own aggressive charging practices.

It is also obvious that many hospitals besides Tenet caused the FLT to increase over the class period, which under Boca's theory

---

**16.** Approximately 350 hospitals, more than 10% of the proposed class, increased their charges out of proportion with their costs to such an extent that their actual CCRs declined more than that of the typical turbocharging Tenet hospital identi-

fied by Boca. *See* DE–289, Ex. G (Palmer Decl.) ¶ 27. Yet all of these hospitals remain in the class because their actual CCRs remained above Boca's low National Threshold dividing line.

caused injury to the class. While the FLT rose by over $3000 between FY 2000–01, for example, Boca's own experts calculate that Tenet only caused about $700. *See* DE–258, Ex. A (DaVanzo Report) (attachment 5). The remaining *majority* of the increase in the FLT had to come from other hospitals' overcharging, regardless of whether the hospitals' CCRs were below the low National Threshold line.

The foregoing legal and factual points demonstrate that while Boca's proposed class is objectively ascertainable, it does not represent a reasonable or fair means of separating culpable turbochargers from innocent non-turbochargers. It bears emphasizing that the Court has yet to determine where to draw the line between lawful and unlawful charging conduct, if there is such a line to be drawn. But even without determining exactly where the line should be drawn, Boca's definition is not workable or practicable because it is not grounded in fact or law and does not rationally separate hospitals that allegedly received or transported stolen outlier funds from those that did not. Furthermore, as discussed below, the definition Boca employs undermines the prerequisite of typicality and exposes class conflicts. These problems form an independent basis to deny certification.

## B. Federal Rule 23(a) Factors

### 1. The Proposed Class is Sufficiently Numerous.

■ Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." While there is no magic number of putative class members necessary to satisfy the numerosity standard of Rule 23(a)(1), the Eleventh Circuit has indicated that more than forty class plaintiffs is enough to satisfy the rule. *See Cox v. Amer. Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir.1986). A plaintiff is not required to provide the exact size of the proposed class, only a reasonable estimate that the number is large enough to render joinder of the individual class members impracticable. *See Walco Invest., Inc. v. Thenen,* 168 F.R.D. 315, 324 (S.D.Fla.1996); *In re Disposable Contact Lens Antitrust Litig.,* 170 F.R.D. 524, 529 (M.D.Fla.1996).

Boca identifies over 3,000 hospitals throughout the United States that received at least one outlier reimbursement during the relevant class period and whose CCR never fell below the low National Threshold line. *See* DE–246, Ex. A (class list). Joinder of each of these hospitals would be highly impracticable, and Tenet does not argue otherwise. Further, there is no dispute that the class hospitals are spread throughout the United States. Such geographical diversity makes their joinder inconvenient. Accordingly, the Court finds that the proposed class would be large enough to meet the numerosity requirement of Rule 23(a)(1).

### 2. The Proposed Class Members Share Common Questions of Law and Fact

■ Rule 23(a)(2) requires that "there are questions of law or fact common to the class." This prerequisite does not mandate that all questions of law or fact are common; a single common question of law or fact is sufficient to satisfy the commonality requirement, as long as it affects all class members alike. *See In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 685 (S.D.Fla.2004); *Hammett v. Am. Bankers. Insur. Co.,* 203 F.R.D. 690, 694 (S.D.Fla.2001). "The threshold for commonality is not high." *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484, 490 (S.D.Fla.2003). In particular, where the defendant is alleged to have committed a common scheme of misconduct against the class, common questions of law or fact will usually exist. *Id.; see also Terazosin,* 220 F.R.D. at 685–86 (citing *Roper v. Consurve, Inc.,* 578 F.2d 1106, 1113 (5th Cir.1978)).

Boca argues that all of the potential class plaintiffs share some common factual and legal questions because all plaintiffs' claims arise from the same turbocharging by Tenet. More specifically, Boca alleges, and Tenet does not seriously dispute, that all plaintiffs share common questions of: (1) what amount of outlier payments were illicitly recovered by Tenet, if any; (2) what effect Tenet's allegedly illicit conduct had on the FLT, if any; and (3) whether Tenet's alleged scheme violates RICO. Whatever other factual or

legal distinctions may exist, Boca has at least identified several common questions of law and fact to meet the requirements of Fed. R.Civ.P. 23(a)(2).

### 3. Boca's Claims Are Not Typical.

■ The third prerequisite for class certification is that the representative plaintiff's claims "are typical of the claims ... of the class" Fed.R.Civ.P. 23(a)(3). The focus of typicality is whether the class representative is aligned enough with the proposed class members to stand in their shoes for purposes of the litigation and bind them in a judgment on the merits. A representative is typical if it is a class member and it "possess[es] the same interests and suffer[s] the same injury" as other class members. *Falcon,* 457 U.S. at 156, 102 S.Ct. 2364 (citation omitted). Typicality requires a "nexus between the class representative's claims ... and the common questions of law or fact which unite the class." *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir.1984). Thus, typicality is often met when, in proving its own case, the representative plaintiff establishes the elements needed to prove the class members' case. *See Brooks v. Southern Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 58 (S.D.Fla.1990). However, typicality is undermined when a unique defense would impair the alignment of interests between the named plaintiff and the class. *See id.*

Boca and the potential class members all received at least one outlier payment during the class period which Boca asserts should have been higher but for Tenet's turbocharging. Boca further alleges that Tenet's conduct increased the FLT in a uniform manner, thereby depriving all eligible hospitals of outlier payments, albeit in different degrees. Because the claims of Boca and the class member hospitals arise from the same scheme by Tenet throughout the class period, and rest on the same RICO theory, at first blush Boca's claims appear typical of the class members' claims. Assuming Boca shows that Tenet received outlier payments to which it was not entitled, that such con-

duct amounts to a RICO violation, and that it thereby increased the FLT, Boca will have laid a significant foundation for the class members to prove their claims.

Notwithstanding the foregoing, however, Tenet advances two compelling arguments against typicality. First, Tenet maintains that significant factual differences among the proposed class members undermines the nexus between Boca and the majority of the class with respect to Boca's theories of liability and damages. Second, Tenet argues that the defense of unclean hands against Boca impairs the alignment of interests between itself and the class members.

#### a. Factual Differences Undermine Typicality

As a factual matter, Tenet asserts that Boca's claim is not typical of many of the proposed class members' claims because Boca engaged in similar turbocharging activity of which it accuses Tenet. Tenet states that Boca increased its charges substantially during the class period and offers testimony of Boca's witnesses to show that Boca increased its charges without regard to costs. *See* Tenet Opp. at 10. Tenet also states that Boca's CCRs declined, on average during the class period, faster than the CCRs of 85 percent of the proposed class. *See id.;* DE–289, Ex. I (Lieberman Decl.) ¶¶ 14, 33.

In response, Boca maintains that its charge increases were not as high as Tenet suggests and that its charging is distinguishable in any event because Boca did not *intentionally* manipulate the Medicare outlier program. *See* Renewed Motion at 14 n. 14 ("there is not a shed of evidence that Boca ever intentionally raised charges to obtain increased outliers ... [and] Boca's conduct stands in stark contrast to Tenet's intentional manipulation of the Medicare outlier program.").[17] Assuming that Boca's intent did differ from Tenet's, however, it remains that Boca's CCR increased more rapidly than a significant percentage of the class members

---

**17.** Boca's reliance on its intent to distinguish itself from Tenet counsels against class certification because it would require the Court to delve into the individual reasons for each of the pro-

posed class hospitals' charging practices. That problem bears more directly on the question of predominance though, not typicality.

and this fact suggests that Boca's own conduct may have contributed to the increase in the FLT.

Likewise, while Boca asserts that its claim is typical because it results from the same course of conduct by Tenet, and because the claims are based on the same RICO theory, the divergent charging patterns within the proposed class (as reflected by the class hospitals' divergent CCRs) place many of the class plaintiffs on a different footing than Boca with respect to Tenet's conduct. For example, Boca's selection of the low National Threshold line as a means of determining turbochargers from non-turbochargers clearly favors hospitals, like Boca, with CCRs closer to the low National Threshold line than hospitals with much higher CCRs. Taking the Fiscal Year 2000 as an example, the average range of CCRs for all hospitals was as high as .665 for urban hospitals and as high as .732 for rural hospitals. *See* DE–258 (DaVanzo Report) at 18. The low National Threshold for that year was .209, and Boca's CCR was .377. *See id.* A hospital with a higher CCR, say .700 or even .500, would profit from choosing a higher standard for separating turbochargers from non-turbochargers than the low National Threshold line Boca uses. A higher standard of liability, say .400, would capture more hospitals that overcharged, isolate more of the increased FLT (i.e., the injury), and correspondingly result in a higher recovery of lost outliers. Of course, Boca cannot choose a CCR higher than .377 as the liability standard for FY 2000 because that would implicate Boca as a turbocharger.

Similarly, Boca's choice of a liability and damages model that only applies the actual CCRs of Tenet hospitals in recalculating outlier payments, clearly favors class hospitals whose settled CCRs are higher than their actual or unsettled CCRs.[18] Continuing to

use settled rather than actual CCRs in the damages calculations allows some class hospitals to reap higher damages awards than others, merely because they charged more for their hospital services to begin with.

The foregoing demonstrates that while Boca and the class share the same RICO claim, they stand in vastly different positions with regard to what the proper standards should be for determining unlawful conduct and in calculating damages. As such, Boca's claims are not truly typical of the class.

### b. The Defense of Unclean Hands Also Counsels Against Typicality

Tenet argues that Boca's own charging conduct precludes class certification because it gives rise to an unclean hands defense which Tenet has asserted against Boca. Boca responds that unclean hands is not a viable defense to civil RICO claims for damages, and therefore cannot undermine its typicality. While it is true, as Boca says, that the "Eleventh Circuit has never found the availability of [an unclean hands] defense to a civil RICO claim," Renewed Motion at 15, it is equally clear that the Eleventh Circuit has not held otherwise.

Although not definitive, the Eleventh Circuit's recent pronouncements on this issue in *Sikes v. Teleline, Inc.*, 281 F.3d 1350 (11th Cir.2002), and *Official Committee of Unsecured Creditors v. Edwards*, 437 F.3d 1145 (11th Cir.2006), indicate that it would be receptive to Tenet's argument. In *Sikes*, the Eleventh Circuit suggested that civil RICO claims based on illegal gambling were rare because "plaintiffs may be barred from bringing such a claim by the 'unclean hands' doctrine." 281 F.3d at 1366 n. 41. More recently, in *Edwards* the Eleventh Circuit held that the related defense of *in pari delicto* applies in civil RICO actions. *Id.* at 1155–

---

18. For example, if one were to use Boca's damages model to adjust the fixed loss threshold by replacing *all* hospitals' settled CCRs with their unaudited CCRs, almost half of the proposed class—those with CCRs that were declining at a slower rate than the CCRs of the proposed class as a whole—would receive higher damages. *See* DE–289, Ex. G (Palmer Decl.) ¶¶ 15–16. The other half of the proposed class—those with CCRs that were declining relatively quickly—

receive higher damages under Boca's proposed methodology, which adjusts the fixed loss threshold by substituting only the unaudited CCRs of 76 Tenet hospitals. *See id.* Based on these facts, it is clear that class members whose CCRs declined more slowly have a concrete economic interest in prosecuting this action under a different theory of liability and damages than the one that Boca has proposed.

56. While the Eleventh Circuit was particularly focused in *Edwards* on the fact that the plaintiff was a co-conspirator with the defendant, a necessary element of that defense, its analysis of the policy of the civil RICO statute implies that the result would be the same in an unclean hands defense, where there is no requirement that the plaintiff act in concert with the defendant. *See id.* at 1155 ("It would be anomalous, to say the least, for the RICO statute to make racketeering unlawful in one provision, yet award the violator with treble damages in another provision of the same statute.").[19]

Boca also argues that the "mere possibility" of a unique defense does not preclude class certification. This is not exactly correct. "The existence of a unique defense ... is relevant to the certification decision." *Ross v. Bank South, N.A.*, 837 F.2d 980, 990, *vacated on other grounds*, 848 F.2d 1132, 1133 (11th Cir.1988). "[E]ven an arguable defense can vitiate" certification "if it will distract the named plaintiff's attention from the issues common to the class." *Id.* at 990–91. However, the certification decision rests within the discretion of the court, such that the court is not required to deny certification if it concludes that the existence of a unique defense is "speculative." *Id.* at 991; *see also* 5 Moore's Federal Practice § 23.24[5] ("Typicality will not be present if the class representative's claim is subject to one or more unique defenses that likely will be central to the litigation. A unique defense that is central to the litigation precludes a finding of typicality because of the danger that the unique defense will preoccupy the class representative to the detriment of the interests of absent class members.") (citations omitted). As in all class certification questions, the burden of proving typicality, *i.e.*, the absence of a unique, certification-defeating defense, rests on the plaintiff. *See Rutstein*

*v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir.2000).

Applying these standards, the Court concludes that Boca has not put to rest Tenet's challenges to the typicality requirement in light of Tenet's unclean hands defense. Given the recent decisions from the Eleventh Circuit, Tenet's unclean hands defense is more than a mere possibility, and it is clear that Tenet's defense will require an in-depth analysis of Boca's charging practices and intent which has the potential of distracting focus from the common issues. In sum, the differing factual circumstances surrounding the various class plaintiffs, plus Tenet's unclean hands defense, thwarts Boca's claim of typicality and precludes class certification in this case.

### 4. Fundamental Class Conflicts Undermine Boca's Adequacy

■ The fourth element of the Rule 23(a) analysis requires that the "representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). This requirement "involves questions [1] of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and [2] of whether plaintiffs have interests antagonistic to those of the rest of the class." *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir.1985); *accord Valley Drug*, 350 F.3d at 1189.

### a. Class Counsel Are Qualified

Tenet does not dispute that Boca's counsel are qualified and experienced to conduct this litigation. Boca's submissions regarding counsels' extensive class action experience in general, and their complex health care litigation experience in particular, demonstrates that counsel are more than adequate to meet the challenges of this case. *See* DE–114

---

19. Boca's reliance on *Kiefer–Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), *overruled on other grounds, Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), is misplaced. In that case, the Supreme Court held that a plaintiff's alleged violations of the Sherman Act were not a viable defense to Sherman Act claims against the defendant alleging a separate conspiracy, stating

"[t]he alleged illegal conduct of petitioner ... could not legalize the unlawful combination by respondents nor immunize them against liability to those they injured." *Kiefer–Stewart*, 340 U.S. at 214, 71 S.Ct. 259. In *Edwards*, the Eleventh Circuit specifically distinguished Sherman Act cases like *Kiefer–Stewart* when it held that the *in pari delicto* defense is available in a RICO action, even though it is unavailable in antitrust cases. *Edwards*, 437 F.3d at 1155–56.

(Initial Motion), Ex. A and B. Indeed, counsels' efforts thus far confirm that they are committed to its vigorous prosecution and that they have the skill and resources to fulfill the job. The Court therefore finds that Boca's proposed class counsel would fairly and adequately protect the interests of the class, in compliance with Rule 23(a)(4).

### b. Class Conflicts

Notwithstanding the qualifications of counsel, it is axiomatic that "a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class." *Pickett,* 209 F.3d at 1280 (citation omitted); *see also Valley Drug,* 350 F.3d at 1189. To defeat class certification, the conflict must be "a fundamental one, going to the specific issues in controversy." *Pickett,* 209 F.3d at 1280. "[A] class conflict can be established in one of two ways: (1) where the record shows hard evidence of an actual disagreement or conflict; or (2) where the class is such that the court can simply imply that a realistic possibility of antagonism exists." *In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 688 (S.D.Fla.2004). A class conflict precludes a finding that the proponent of class certification has satisfied Rule 23(a)(4). *See Valley Drug,* 350 F.3d at 1189.

Boca argues that its interests are aligned with those of the class members as a matter of law and fact. As a legal matter, Boca contends that the Eleventh Circuit proscribes class certification on conflicts grounds only where members of the proposed class benefitted specifically from the class defendant's conduct. In its view, the case law does not preclude class certification in cases in which class members engaged in, and benefitted from, the same type of conduct for which the class seeks to hold the defendant liable. As a factual matter, Boca argues that Tenet has not produced any hard evidence that the class includes hospitals that engaged in the conduct for which it seeks to hold Tenet liable. Tenet reads the Eleventh Circuit's case law more broadly to preclude certification in any case in which the named plaintiff's interests diverge significantly from those of other members of the proposed class. Tenet also presents statistics and other evidence that, it claims, demonstrate that a significant number of hospitals that increased their charges out of proportion to their costs, and impacted the FLT, are in the proposed class.

The parties' legal dispute arises out of two key Eleventh Circuit cases: *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181 (11th Cir.2003), and *Pickett v. Iowa Beef Processors,* 209 F.3d 1276 (11th Cir.2000). The plaintiffs in *Valley Drug* complained that they and other direct purchasers of terazosin hydrochloride (sold under the brand name "Hytrin") were harmed when Abbott Laboratories, the manufacturer of Hytrin, entered into allegedly anticompetitive settlement agreements with generic drug manufacturers. 350 F.3d at 1186. Plaintiffs alleged that these settlement agreements improperly kept generic versions of Hytrin off the market and caused direct purchasers to lose discounts on purchases of generic Hytrin that they might have received in the absence of the agreements. *Id.* They sought, and the district court granted, certification of a class of all persons who purchased the drug Hytrin directly from Abbott, *id.,* despite defendants' assertion that a significant portion of the class actually benefited from the absence of generic drugs in the market, *id.* at 1190. In the Eleventh Circuit, the defendant raised the issue of conflicts, and the Eleventh Circuit reversed. Noting that "[a] fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefited other members of the class," *id.* at 1189, the Eleventh Circuit held that the "plaintiffs ha[d] not met their burden under Rule 23(a)(4) of demonstrating that no fundamental conflict exists within the class," *id.* at 1190.

Likewise, in *Pickett* the Eleventh Circuit also reversed a district court's class certification order on conflicts grounds. The *Pickett* district court had certified a class of cattle producers in a case challenging Iowa Beef Processors' ("IBP") allegedly discriminatory practice of using forward contracts and marketing agreements to force producers selling on spot markets to accept lower prices. 209

F.3d at 1278. On appeal, the Eleventh Circuit concluded that the plaintiffs "could not possibly provide adequate representation" to the class because the class "include[d] producers who willingly entered into forward contracts and marketing agreements with IBP as well as those who complain of and claim harm from that practice." *Id.* at 1280–81.

In *Valley Drug* and *Pickett* the proposed classes contained members that were involved in the specific conduct of which the named plaintiff complained. And, in both cases, class members had relationships or acted in concert with the defendant. Neither of those circumstances is present here. But *Valley Drug* and *Pickett* are not, as Boca suggests, limited to their facts, and the Eleventh Circuit never suggested that they were. While *Valley Drug* and *Pickett* represent one subset of possible class conflicts cases, they do not foreclose the possibility that other types of conflicts may preclude class certification. To the contrary, both *Valley Drug* and *Pickett* speak broadly about the dangers of class conflicts and explain that a certification-defeating class conflict may be found in any case in which the interests of the class representative are sufficiently at odds with those of the class members. For example, in *Pickett,* the court stated that "a class cannot be certified when its members have opposing interests *or* when it consists of members who benefit from the same acts alleged to be harmful to other members of the class." 209 F.3d at 1280 (emphasis added). The court's disjunctive statement indicates that *either* fact pattern will defeat class certification. *See also Valley Drug,* 350 F.3d at 1189 (quoting *Pickett's* conflicts rule with approval).

*Valley Drug* cast the conflicts rule in similarly broad terms when it stated that it interpreted Rule 23(a)(4) "to preclude class certification where the economic interests and objectives of the named representatives differ significantly from the economic interests

and objectives of unnamed class members." *Id.* at 1190. Nowhere in these cases, or in any other case that Boca has cited, has the Eleventh Circuit purported to limit the definition of a "conflict" to cases where the class members conspired with or otherwise acted in concert with the named defendant, as Boca's argument suggests.

Applying the Eleventh Circuit's standard that a class action cannot be maintained where a representative's interests, particularly its economic interests, conflict with or oppose those of the class members, Tenet argues that the Court may not certify Boca's proposed class because the class includes many hospitals that engaged in the same or similar conduct for which Boca seeks to hold Tenet liable. The interests of these class-member turbochargers conflict, Tenet contends, because a finding of liability against Tenet would necessarily imply that those hospitals' conduct was also unlawful. *See* Tenet Opp. at 6 & n. 3.

To support its theory, Tenet has identified examples of many different types of charging behavior among class members that impacted the FLT and, therefore, under Boca's theory caused injury and damages to the class. It points to a number of hospitals in the proposed class with outlier payments so high that the former Administrator of CMS, Thomas A. Scully, testified that they were " 'way, way beyond anything that is rational or understandable to us.' " Tenet Opp. at 4 (quoting Medicare Outlier Payments to Hospitals: Hearing Before Subcomm. on Labor, Health & Human Servs. of the Sen. Comm. on Appropriations, 108th Cong. 268 at 5 (Mar. 11, 2003) (testimony of Thomas A. Scully, Administrator of CMS)).[20] Because high total outlier overpayments caused CMS to increase the FLT during the class period, these class hospitals necessarily contributed to that increase and caused all hospitals' outlier payments to be lower than they would

---

20. For instance, 30 out of 121 hospitals that the Department of Justice identified as hospitals with unreasonably high outlier percentages in Fiscal Year 2002 (which was deemed to be 20% of total Medicare reimbursements) are still in Boca's proposed class. *See* Tenet Opp. at 6 (citing 9/27/06 Boedeker Decl. ¶ 15 & Exhibit 1 thereto). Furthermore, 125 hospitals in the proposed class

had outlier percentages greater than 20% during the entire proposed class period. *See id.* at 7 (citing 9/27/06 Boedeker Decl. ¶ 17 & Exhibit 3 thereto). And a total of 221 hospitals in the proposed class had outlier percentages greater than 15% during the proposed class period. *See id.* (citing 9/27/06 Boedeker Decl. ¶ 17 & Exhibit 5 thereto).

have been otherwise. Likewise, other proposed class-member hospitals increased their charges as fast or faster than the typical Tenet "turbocharging" hospital during the class period, evidencing that they too were increasing charges out of step with their costs.[21] Tenet also asserts that 82 percent of the proposed class, or a total of 2,755 hospitals, had CCRs that declined during the proposed class period, signaling that their charges increased more than their costs during that time. *See id.* at 8 (citing Lieberman Decl. ¶¶ 7, 11). Because, generally speaking, declining CCRs lead to increasing outlier payments, and because Boca's theory is that increases in outlier reimbursement led to increases in the Medicare fixed loss threshold, this fact implies that under Boca's own theory of the case 82 percent of the proposed class was, in some way, responsible for increases in the Medicare fixed loss threshold, thus harming the remaining 18 percent of proposed class members whose CCRs remained stable or increased over the proposed class period. *See* Tenet Opp. at 8 (citing Lieberman Decl. ¶¶ 7–8, 22–25).

Boca's own expert acknowledges that the proposed class includes hospitals that increased charges out of step with costs and got increased outlier payments as a result. *See* DE–244 (May 19, 2006 Booth Dep.) Tr. at 148 ("Q: So hospitals who indeed intended to raise charges without relation to costs may still be in the class; is that right? A: Yes."); *id.* at 141 ("Q: Is it the case that there may be hospitals whose charges are not reasonably related to costs that are included in the class? A. Yes. Q. Does the complaint exclude hospitals who increase charges to obtain more Outlier payments? A. No."). In fact, Boca's own expert calculates that Tenet is only responsible for $704 of the $3,146 increase in the FLT for FY 2000, to take one year as an example. *See* DE–258 (DaVanzo Report) (attachment 5). Excessive payments to other hospitals contributed to the remaining $2,442 increase in the FLT, and corre-

sponding injury to the class, even if those hospitals had CCRs that were above the low National Threshold and are therefore in the class.

Instead of challenging Tenet's class conflicts evidence head on, Boca argues that its proposed class is entitled to certification because it has defined the class so that "Tenet will not be forced to pay damages to a hospital that was engaged in the same type of conduct upon which the Class seeks damages from Tenet." Renewed Motion at 19. Boca further argues that Tenet's assertion that the class as currently defined contains "turbochargers" does not establish class conflicts, because Tenet's claim "is completely tied to theories of liability *not* in this case." Reply II at 6. Boca's response misses the point of Tenet's objection. Tenet has shown that if one looks beyond the artificial line Boca has drawn between hospitals and analyzes the actual facts, it is undeniable that many of the class hospitals have aggressively charged for their services and have contributed to the increase in the FLT. In this way, they have acted much like Tenet and they have caused the same type of injury as Tenet. Boca cannot avoid the facts merely by drawing an arbitrary line between hospitals. As explained above, there is no rational basis for so distinguishing between hospitals.

But even ignoring the issues raised with using the low National Threshold as a demarcation line between "turbochargers" and "non-turbochargers," Boca's argument still does not prove an absence of conflicts within the class. In addition to showing that the class could likely contain a number of hospitals that engaged in behavior similar to Tenet's, and had similar effects on the FLT, Tenet's evidence also shows that charging behavior varied widely among hospitals in the class. Even if no class members were "turbochargers," as Boca contends, and therefore stand to gain from a claim that

---

21. More than 300 proposed class members increased their charges as fast or faster than a typical Tenet "turbocharging" hospital. *See* DE289, Ex. G (9/29/06 Palmer Decl.) ¶ 25. Even after adjusting for hospital size and case complexity, 250 proposed class members increased charges at least as much as the typical Tenet

"turbocharging" hospital. *See id.* ¶ 26. Finally, about 350 proposed class-member hospitals increased their charges so much more rapidly than their costs that their unaudited CCRs declined more than that of the typical Tenet "turbocharging" hospital. *See id.* ¶ 27.

Tenet improperly drove its hospitals' CCRs below the low National Threshold line, various individual class members would stand to gain *more* from a different liability theory, *e.g.*, that any hospital that raised its charges by more than 20% per year was a "turbocharger" or that class members whose increases in charges outpaced increases in costs by a certain percentage were "turbochargers." Alternatively, the 18% of hospitals with stable CCRs could logically argue that any hospital with a declining CCR (representing all hospitals whose charges are outpacing their costs) are culpable of turbocharging. Neither of these proposed member hospitals' interests are aligned with Boca's even under Boca's low National Threshold theory.

More problematic, however, is the fact that Boca's argument depends on whether the low National Threshold provides a rational dividing line between turbocharging hospitals and non-turbocharging hospitals. As previously explained, it does not. Tenet's evidence shows that there likely are hospitals in the class that either engaged in conduct similar to Tenet or impacted the FLT, or both. These hospitals are not entitled to additional outlier payments; to the contrary, it is clear that they profited from the same type of conduct that Tenet allegedly engaged in, and therefore have economic interests contrary to the hospitals in the class that did not engage in such conduct. Moreover, Tenet's evidence also makes clear that the number of "turbochargers" in the class varies greatly depending on the way a "turbocharger" is defined. The answer to the question of who is a "turbocharger" is critical to individual class members because it will determine not only whether each of them can recover against Tenet, but also whether any class members themselves contributed to an increase in the FLT, which under Boca's theory would have harmed other class members and Medicare participants, thereby opening the door to potential liability. While this Court cannot resolve that question on class certification, it is clear that the low National Threshold is not a rational or workable dividing line, and that whatever the dividing line, if any, between turbochargers and non-turbochargers, Boca's proposed class includes potential turbochargers.

## C. Federal Rule 23(b)(3)

In addition to the prerequisites of Rule 23(a), class certification under Rule 23(b)(3) requires Plaintiff to show that "[1] questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and [2] that class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

### 1. Predominance

■ In order for common questions of law or fact to predominate over individualized questions "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Rutstein*, 211 F.3d at 1233. As the Eleventh Circuit has recently explained:

Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to ... relief. Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized legal proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b).

*Klay*, 382 F.3d at 1255 (citations and internal quotations omitted). To evaluate predominance, the Court must "examine the causes of action asserted in the complaint on behalf of the putative class." *Rutstein*, 211 F.3d at 1234. As described above, there are common questions of law and fact in this case concerning whether Tenet's actions amount to a violation of the outlier program, whether that conduct violated RICO, and consequently whether and to what extent the FLT was impacted and other hospitals injured. These claims arise from allegations of a common pattern by Tenet of manipulating its charges and costs. In particular, looking at the ele-

ments of the RICO claims asserted, Plaintiffs will all have to show: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *Williams v. Mohawk Indus., Inc.*, 411 F.3d 1252, 1256 (11th Cir. 2005) (citation omitted). None of these elements require any showing of the individual hospitals' conduct or state of mind, but rather focus solely on Tenet's conduct and can be proved with reference to Tenet documents and employees.[22] Furthermore, to establish the requisite pattern, Boca must show at least two predicate acts. *Id.* at 1256–57. The predicate acts alleged here are violations of sections 2314 and 2315 of the National Stolen Property Act ("NSPA"), 18 U.S.C. §§ 2314–15. To prevail on these predicate claims Boca must show that Tenet received, possessed, transported, transmitted, or transferred in interstate commerce more than $5000 that was stolen or converted, with knowledge that the monies were stolen or converted. *See* 18 U.S.C. § 2314–15. Again, all of these elements focus on Tenet's conduct, not the class hospitals, and can be proved with common evidence derived from Tenet's documents and witnesses.

Tenet does not seriously dispute that Boca and the class share many common issues with respect to the question of liability.[23] Rather, the chief thrust of Tenet's challenge to predominance is that the absence of a satisfactory methodology for determining damages on a class-wide basis renders certification untenable. However, the standard for evaluating a proposed damages model at this stage is not high: "In assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed method [for computing damages] is so insubstantial as to amount to no method at all." *Klay*, 382 F.3d at 1259 (quoting *Terazosin Antitrust*

*Litig.*, 220 F.R.D. at 698) (bracketed material added in *Klay* ); *see also Terazosin Antitrust Litig.*, 220 F.R.D. at 698 ("At the class certification stage, therefore [a named plaintiff] need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis.").

While the Court shares some of Tenet's concerns with Boca's damages methodology, Boca's conceptual approach to computing class-wide damages is sound. Boca's basic theory is to measure the impact of Tenet's excessive outlier reimbursements on the FLT during the class period, use that to calculate a "Tenet-adjusted FLT," and then recalculate all of the class hospitals' outlier payments using this adjusted FLT. Specifically, Boca's proposed methodology proceeds in six steps:

1. Validate and calibrate the FLT.
2. Calculate the Tenet-adjusted FLT.
3. Validate the CMS outlier payments using the Lewin Model.
4. Calculate outlier payments for Class members using the actual FLT.
5. Calculate outlier payments for Class members using the Tenet-adjusted FLT.
6. Calculate damages defined as the difference between outlier payments to Class members using the actual FLT and the Tent-adjusted FLT by year and in total.

*See* DE–258, Ex. A (DaVanzo Report) at 24.

Tenet raises a host of concerns with regard to these six steps. As one example, Tenet points out that Boca's experts have not identified any formula used by CMS to calculate the FLT, other than the so-called "itera-

---

**22.** To the extent Boca argues that it and the class members are not themselves liable as turbochargers because their "intent," or other particular characteristics, distinguish them from Tenet, *see* Renewed Motion at 11–12 & n. 11, Boca's theory of liability would require an individualized inquiry that would threaten to swamp the common issues in the case. Although Boca does selectively use intent throughout its papers to distinguish itself and other hospitals from Tenet, it is clear that intent is not a feature of its class definition and not a necessary a feature of its liability theory.

**23.** The Court dismisses Tenet's suggestion that individual issues predominate because class plaintiffs would have to show, under either 18 U.S.C. §§ 2314 or 2315, that Tenet knew it was receiving or transporting outlier funds that were stolen *from each particular hospital.* *See* Opp. at 19. It would be enough for Boca to show that Tenet knew the funds were stolen from the government.

tive process." Without a precise formula, the task of simulating where CMS would have set the FLT in a world without Tenet's turbocharging (i.e., calculating the "Tenet-adjusted FLT") involves a certain element of "best guessing," the reliability of which the Court anticipates Tenet will more appropriately raise in a *Daubert* motion. Additionally, Tenet complains that Boca's model formulates damages simply by applying post–2003 regulations to Tenet's pre–2003 conduct, without actually measuring the impact of Tenet's alleged unreasonable charging on the FLT. As such, Boca arguably does not measure the actual effect of Tenet's allegedly unlawful conduct of turbocharging, but instead simply holds it to a different standard.

While Tenet's concerns are not to be taken lightly, the Court is satisfied that Boca's basic theory meets the minimal standard of plausibility to withstand attack at this stage. As suggested, Tenet's critique is better suited to a formal *Daubert* challenge. For this reason, Boca has adequately demonstrated that common issues will predominate over individual issues.

### 2. Superiority

■ In determining whether a class action is superior to other available methods of adjudicating Boca's claims, the Court should consider:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Boca argues that the class action mechanism is a superior means for class members to achieve "fair and efficient redress for Tenet's outlier misconduct" because proceeding as a single plaintiff would be uneconomical in light of "Tenet's vast litigation resources." Reply II at 10. While establishing Boca's claims will undoubtedly be costly, this case is a far cry from the prototypical negative-value suit, which involves "an aggregation of small individual claims, where a large number of claims are required to make it economical to bring suit." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 813, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Indeed, the Eleventh Circuit has recognized that "even small individual claims under RICO can be feasible given the possibility of the award of treble damages and attorneys' fees to successful plaintiffs." *Andrews v. Am. Tel. & Tel. Co.,* 95 F.3d 1014, 1025 (11th Cir.1996). This is not even a "small" claim. Boca estimates that its damages in this case amount to $445,000 *before trebling. See* Renewed Motion at 20. Accordingly, Boca overstates its economic rationale for class status.

Furthermore, no reason has been put forth why individual hospitals or discrete groups of hospitals, like the Florida public hospitals whose case was previously consolidated with this one and settled, may not bring separate cases against Tenet on the same or a similar legal theory.[24] Indeed, the fact that other hospitals were able and willing to sue separately is a factor that counsels against certification. In fact, as described above, individual class plaintiffs (or groups of class plaintiffs) with divergent charging practices from Boca's have an interest in pursuing theories of liability and damages that differ from those chosen by Boca in this case. Those hospitals have a strong interest in controlling the prosecution of separate actions. In light of these facts and the myriad complications of, and problems with, prosecuting this case as a class action set forth above, this Court concludes that a class action is not the superior method of adjudicating the issued raised in this case.

### IV. Conclusion

For the forgoing reasons it is hereby ORDERED that Plaintiff Boca Raton Communi-

---

24. The Florida Attorney General sued Tenet under the same legal theories on behalf of thirteen Florida public hospitals. *See State of Florida v.*

*Tenet Healthcare Corp.,* Case No. 05–20591–Civ–Seitz.

ty Hospital Inc.'s Renewed Motion for Class
Certification [DE–255] is DENIED.